Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2020 CO 44**

**No. 17SC116, *People in Interest of R.D.*—First Amendment—True Threats—Social Media.**

The supreme court reviews whether the court of appeals erred in determining that threatening messages the juvenile defendant posted on Twitter were protected speech under the First Amendment.  In so doing, the court refines its earlier statements of the general framework for distinguishing a true threat from constitutionally protected speech and offers specific guidance for applying that test to statements communicated online.

The court holds that a true threat is a statement that, considered in context and under the totality of the circumstances, an intended or foreseeable recipient would reasonably perceive as a serious expression of intent to commit an act of unlawful violence.  In determining whether a statement is a true threat, a reviewing court must examine the words used, but it must also consider the context in which the statement was made.  Particularly where the alleged threat is communicated online, the contextual factors courts should consider include, but

are not limited to (1) the statement's role in a broader exchange, if any, including surrounding events; (2) the medium or platform through which the statement was communicated, including any distinctive conventions or architectural features; (3) the manner in which the statement was conveyed (e.g., anonymously or not, privately or publicly); (4) the relationship between the speaker and recipient(s); and (5) the subjective reaction of the statement's intended or foreseeable recipient(s).

The court reverses the judgment of the court of appeals and remands with instructions to return the case to the juvenile court to reconsider the adjudication under the refined framework.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

### 2020 CO 44

---

### Supreme Court Case No. 17SC116
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA1800

---

### Petitioner:

The People of the State of Colorado,

### In the Interest of

### Respondent:

R.D.

---

### Judgment Reversed
*en banc*
June 1, 2020

---

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
Joseph G. Michaels, Assistant Attorney General
   *Denver, Colorado*

**Attorneys for Respondent:**
Megan A. Ring, Public Defender
James S. Hardy, Deputy Public Defender
   *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

¶1 The First Amendment's protection of speech is robust, but not absolute: it does not, for example, safeguard the utterance of a "true threat." The task of identifying a true threat has been complicated by the advent of social media. At the same time, the proliferation of online expression has amplified the potential for threatening words to cause harm. This case, which stems from a late-night argument on Twitter among several high school students, requires us to confront this changed communication landscape and to refine the applicable framework for distinguishing a true threat from constitutionally protected speech where that communication occurs in the cyber arena.

¶2 R.D., a juvenile, was adjudicated delinquent for harassment by communication under section 18-9-111(1)(e), C.R.S. (2013), based on tweets he directed at another student during a heated exchange that took place in the wake of a local school shooting. The narrow question before us is whether R.D.'s statements were "true threats." If so, then application of the statute to his conduct did not violate his First Amendment right to free speech.

¶3 In light of U.S. Supreme Court case law, we refine our earlier statements of the framework for distinguishing a true threat from constitutionally protected speech. In addition, we take the opportunity to provide guidance for applying that test to statements communicated online.

¶4    We hold that a true threat is a statement that, considered in context and under the totality of the circumstances, an intended or foreseeable recipient would reasonably perceive as a serious expression of intent to commit an act of unlawful violence.[1]  In determining whether a statement is a true threat, a reviewing court must examine the words used, but it must also consider the context in which the statement was made.  Particularly where the alleged threat is communicated online, the contextual factors courts should consider include, but are not limited to (1) the statement's role in a broader exchange, if any, including surrounding events; (2) the medium or platform through which the statement was communicated, including any distinctive conventions or architectural features; (3) the manner in which the statement was conveyed (e.g., anonymously or not, privately or publicly); (4) the relationship between the speaker and recipient(s); and (5) the subjective reaction of the statement's intended or foreseeable recipient(s).

---

[1] We need not resolve today whether the test for true threats under the First Amendment also requires consideration of the speaker's subjective intent to threaten the victim(s).  But even assuming it does, the statutory provision at issue required the State to prove beyond a reasonable doubt that the communication here was made "in a manner intended to . . . threaten bodily injury." § 18-9-111(1)(e).

3

¶5     Because neither the juvenile court nor the court of appeals had the benefit of the framework we adopt today, we reverse the judgment of the court of appeals and remand with instructions to return the case to the juvenile court to reconsider the adjudication applying this refined test.

# I. Facts and Procedural History

¶6      In December 2013, a shooting took place at Arapahoe High School that took the life of a female student and the male student shooter. A few days later, a student from Thomas Jefferson High School ("TJ"), a school in a neighboring district, posted on Twitter[2] a photo of a banner conveying TJ's support for Arapahoe. A student from Littleton High School, which is in the same school district as Arapahoe, tweeted[3] in response that kids from TJ did not care about the shooting because it happened outside their district. A.C., another TJ student and a friend of the original poster, soon got involved because he believed the Littleton student was disrespecting his friend. J.W., A.C.'s friend and fellow TJ student, also got involved, and the group conversation eventually took on a "TJ versus Littleton" character. The Littleton student "mentioned"[4] the handles, or

---

[2] Twitter is a "real-time information network that lets people share and discuss what is happening at a particular moment in time through the use of 'tweets.'" *Dimas-Martinez v. State*, 385 S.W.3d 238, 243 n.3 (Ark. 2011).

[3] A tweet is a message posted to Twitter that might contain text or other media. A tweet appears on the sender's profile page and may appear on the feed, or timeline, of anyone following the sender. *About Different Types of Tweets*, Twitter, https://help.twitter.com/en/using-twitter/types-of-tweets [https://perma.cc/8ZBR-H79E]. The word "tweet" is also used as a verb to describe the act of posting a message on Twitter. *See, e.g., How to Tweet*, Twitter, https://help.twitter.com/en/using-twitter/how-to-tweet [https://perma.cc/9CQ6-3BYE].

[4] A "mention" is a tweet that contains another account's Twitter username, or "handle," preceded by the "@" symbol. When a user's handle is mentioned, the

usernames, of R.D. and another friend from his school, bringing them into the exchange.

¶7    As we discuss further below, the record provides an incomplete picture of the students' back-and-forth.  But it does reveal that R.D. posted the following messages:

- @[A.C.][5] you a bitch, ill come to Tgay and kill you nigga.[6]

- @[A.C.] I don't people who aren't worth my time.  If I see your bitch ass outside of school you catching a bullet bitch.

- @[A.C.] nigga you don't even know me.  Mf I don't even know were tf your lame bitch ass school is.  You a bitch talking shit on here

- @[A.C.] all you fuck niggas will get your ass beat real shit.

- You fuck with the wrong person leave you ass in a body bag.

- @[J.W.] @[A.C.] don't give af bruh.  Don't even know you niggas and you talking shit.

- @[A.C.] you think this shit a game, I'm not playing.  I don't fight fuck boys and I don't twitter beef.

---

user receives notification of the tweet, but the tweet does not appear on the user's public profile.

[5] For purposes of this opinion, we have replaced the students' Twitter handles with their initials.

[6] We reluctantly reproduce this racial slur and other pejorative terms from the record to give an uncensored account of the facts.

6

R.D. also posted a photograph of a handgun resting beside approximately fifty cartridges, along with the message, "@[A.C.] this all I'm saying[.] We don't want another incident like Arapahoe. My 9 never on vacation."

¶8     After this, the record reveals that R.D. and A.C. tweeted as follows:[7]

- A.C.: @[R.D.] you ain't never shot no one so sit down and get off google images bruh

- R.D.: @[J.W.] @[A.C.] idgaf my @ name should have not been in this shit. You fucked with the wrong one.

- R.D.: @[A.C.] I don't even know where tf your school at. I'm not even from Colorado. Trust me I'm not afraid to shoot.

- R.D.: @[A.C.] fuck you and your gay ass school. Don't worry nigga, I'll see you little hoes tomorrow.

- A.C.: @[R.D.] shoot then pussy.

- A.C.: @[R.D.] you are all talk so go the fuck to bed come up to TJ and get slept.[8] Fuck boy.

- R.D.: @[A.C.] haha alright hoe, we'll see whose a bitch tomorrow.

- R.D.: @[A.C.] I'm not about to fight you broke bitch. Let me catch you away from school you is a dead man. Goodnight hoe.

- A.C.: @[R.D.] 3950 S. Holly street. I'll see u tomorrow fuck boy

---

[7] These messages are set out in the order in which R.D. either tweeted or "retweeted"—i.e., shared—them. It is therefore possible that messages authored by A.C. and retweeted by R.D. were originally posted by A.C. in a somewhat different order than represented here.

[8] A.C. later testified that "get slept" usually means to fight or get knocked out.

¶9 Based on these tweets, the People filed a petition in delinquency charging R.D. with harassment under section 18-9-111(1)(e), C.R.S. (2013). As relevant here, that provision prohibits harassment through certain forms of digital communication:

> (1) A person commits harassment if, with intent to harass, annoy, or alarm another person, he or she . . .
>
> (e) [i]nitiates communication with a person, anonymously or otherwise, by . . . text message, instant message, computer, computer network, or computer system in a manner intended to . . . threaten bodily injury . . . .

§ 18-9-111(1)(e). R.D. moved to dismiss the charge, contending that his statements were protected by the First Amendment to the U.S. Constitution and article II, section 10 of the Colorado Constitution.[9]

¶10 At a hearing on the motion, the prosecutor argued that under *Virginia v. Black*, 538 U.S. 343 (2003), and *Watts v. United States*, 394 U.S. 705 (1969) (per curiam), the government may constitutionally regulate speech that constitutes a "true threat." Speech constitutes a true threat, she contended, "when an individual is intending to threaten bodily harm."

---

[9] In this initial motion to dismiss, R.D. contended that his statements could not be constitutionally regulated because (1) they were made in a public forum and (2) they could not be considered "fighting words." Because R.D.'s constitutional claim in this case now focuses on whether R.D.'s tweets constituted "true threats," we restrict our description of the facts and procedural history to this claim.

8

¶11    In arguing that R.D.'s tweets fell into this category of unprotected speech, the prosecutor emphasized "the social context" of the statements, noting they were sent four days after the Arapahoe High School shooting.  She stated that police officers contacted the students who had read the tweets, all of whom said they were afraid.  She further observed that such fear made sense given that a student had so recently been shot.  Finally, she posited that true threats such as R.D.'s need to be regulated to "protect people's feeling of safety."

¶12    The trial court denied R.D.'s motion to dismiss.  In a bench ruling, the court concluded that R.D.'s "particular type of speech is not protected under the First Amendment."  The court noted it had "consider[ed] the argument of counsel and the factors the [c]ourt is to consider," but did not identify what those factors were.  Based on its conclusion that R.D.'s tweets were not protected speech, the court also found that section 18-9-111(1)(e) is not unconstitutional as applied to R.D.[10]

## A.  Trial

¶13    At trial, A.C.'s and J.W.'s testimony revealed that the screenshots and printouts submitted in evidence of R.D.'s tweets painted an incomplete picture of the conversation as it occurred on Twitter.  The prosecution's exhibits consisted of

---

[10] R.D. later filed a supplement to his motion to dismiss alleging for the first time that section 18-9-111(e) is facially overbroad.  The juvenile court never ruled on this supplementary motion.

9

screenshots of some of the messages R.D. authored, but captured almost none of the other students' comments. The defense supplemented this one-sided view of the conversation by introducing a print-out of R.D.'s Twitter profile, which documented both R.D.'s own tweets and messages by others in the conversation that R.D. retweeted.[11]

¶14    Aside from explaining to the adults in the room how Twitter works, A.C. and J.W. testified to their reactions to the exchange. A.C. testified that he construed R.D.'s tweets directed at him as threats; that he did not think R.D. was kidding; and that he understood R.D.'s post containing the picture of a handgun to convey a threat to his life. Yet on cross-examination, A.C. acknowledged that he responded to that post by tweeting that R.D. should "get off google images" because he thought the picture of the handgun was one R.D. had merely downloaded from the internet. He also admitted that he tweeted the address of his school.

_____

[11] Even this document, however, did not include tweets or private messages by other users that may have been part of the conversation, but that R.D. did not share on his public feed. Indeed, many of R.D.'s tweets in the print-out displayed a link to "view conversation," which, if clicked in electronic form, would have revealed other replies in the same exchange. But whatever those other messages said, they are not part of the record.

¶15    J.W.'s testimony was similarly inconsistent.  When asked on direct about R.D.'s "threat to kill," J.W. testified that he did not take it "as a joke" but that he also did not "take it serious."  He said the message was "a little intimidating."  He also testified that students on "both sides" were throwing around insults and talking about physically fighting and that he "didn't really take anything as being very serious."

¶16    In a bench ruling, the juvenile court adjudicated R.D. delinquent.  The court acknowledged that the early part of the Twitter exchange did not establish an intent to alarm under the harassment statute "because [the students] were both engaging in that type of conversation."  The court analogized this early portion of the exchange to a schoolyard fight where everyone is trying to prove they are "bigger[,] better[,] and meaner" than their peers.

¶17    But the conversation crossed the line, the court found, when R.D. posted the picture of the handgun.  Referring again to the schoolyard brawl analogy, the court likened that moment to R.D. lifting his shirt to show that he was armed.  The court reasoned that a brawl and its attendant displays of bravado usually cause "no harm, no foul" if broken up.  But when someone in such a face-to-face interaction says they have a gun, the dynamic becomes menacing.  The court found that R.D.'s message was similar to such a display, although it acknowledged that the tweet was "different" because the students were not face-to-face.

11

¶18 Turning to the statute, the court found beyond a reasonable doubt that R.D. "initiate[d] communication" over a computer network or computer system. It then considered whether R.D. "inten[ded] to threaten" anyone. The court observed that J.W. and A.C. testified that they didn't want to joke about guns, but that they didn't take R.D.'s messages seriously, and pointed out that A.C. told R.D. to "get off google images" and volunteered to him his school's address. But the court concluded that the boys' subjective reactions were irrelevant because the statute does not require that the recipient actually feel threatened or that actual bodily injury occur.

¶19 Relying specifically on R.D.'s post of the picture of the handgun, the court concluded beyond a reasonable doubt that R.D. "initiate[d] communication with a person by computer network, data network, or computer system in a manner intended . . . to threaten bodily injury or property damage to [A.C.] and [J.W.], in violation of [section] 18-9-111(1)(e)." In its ruling, the court made no mention of the First Amendment and did not opine on the statute's alleged unconstitutionality, either facially or as applied to R.D.'s tweets.

¶20 The court sentenced R.D. to write an essay demonstrating that he understood the challenges of online communication. R.D. submitted the essay to the court's satisfaction.

12

## B. Appeal

¶21 R.D. appealed, arguing, as relevant here, that his adjudication should be vacated because application of section 18-9-111(1)(e) to his speech on Twitter violated his First Amendment right to free speech.[12] The People responded that R.D.'s tweets were true threats and therefore unprotected speech.

¶22 The court of appeals agreed with R.D. and reversed and remanded with directions to vacate the adjudication and dismiss the proceeding. *People in Interest of R.D.*, 2016 COA 186, ¶¶ 1, 6, __ P.3d __.

¶23 The court began by acknowledging that the government may regulate certain unprotected categories of speech, such as true threats. *Id.* at ¶ 9. The court defined a "threat" as a "statement of purpose or intent to cause injury or harm to the person, property, or rights of another, by committing an unlawful act." *Id.* at ¶ 10 (citing *People v. McIntier*, 134 P.3d 467, 472 (Colo. App. 2005)). But a "true threat" for purposes of the First Amendment, the court explained, "is not merely talk or jest." *Id.* It is evaluated "in the context in which [it was] spoken or written,"

---

[12] R.D. also challenged the sufficiency of the evidence that he "initiate[d]" communication under 18-9-111(1)(e) and argued that statements he made to his school's resource officer and vice principal should have been suppressed. Neither of these bases for appeal is before us today.

13

and "by whether those who hear or read the threat reasonably consider that an actual threat has been made." *Id.* (quoting *McIntier*, 134 P.3d at 472).

¶24 To determine whether R.D.'s statements constituted true threats, the court of appeals considered both the plain import of the words used and the context in which the statements were made, including (1) to whom the statements were communicated; (2) the manner in which the statements were communicated; and (3) the subjective reactions of those whom the statements concerned. *Id.* (citing *People v. Stanley*, 170 P.3d 782, 790 (Colo. App. 2007), and *Watts*, 394 U.S. at 708).

¶25 Applying that framework, the court concluded that R.D.'s tweets were not true threats because they did not constitute "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at ¶ 11 (quoting *Black*, 538 U.S. at 359). The court reasoned that although the language of R.D.'s tweets was violent and explicit, the context in which the statements were made mitigated their tone in three ways. *Id.*

¶26 First, the court observed that R.D.'s tweets made clear that he did not know A.C. personally and did not know where A.C.'s school was located. *Id.* at ¶ 12. In addition, R.D. never referred to A.C. by name, instead addressing him only by his Twitter handle. *Id.*

14

¶27 Second, the court observed that while R.D. used "@" to direct many of his tweets to A.C., he did not send those messages privately to A.C. alone; instead, they were in public view on R.D.'s profile page. *Id.* at ¶ 13.

¶28 Finally, the court observed that A.C.'s reactions to R.D.'s tweets showed that "he did not view the statements as true threats when they were received." *Id.* at ¶ 15. In particular, the court found significant that when R.D. indicated he did not know where TJ was located, A.C. volunteered the address and tweeted, "I'll see you tomorrow fuck boy"; "you are all talk so go the fuck to bed come up to TJ and get slept"; and "shoot then pussy." *Id.* at ¶ 14. The court also took note of A.C.'s response to the photo of the handgun: "you ain't never shot no one so sit down and get off google images bruh." *Id.* The court gleaned from these tweets that A.C. did not appear threatened and did not take precautionary measures to protect himself from R.D. *Id.*

¶29 Based on these contextual factors, the court concluded that R.D.'s tweets did not constitute true threats. *Id.* at ¶ 16. Accordingly, it held that application of section 18-9-111(1)(e) to R.D.'s conduct violated his First Amendment rights. *Id.* at ¶ 21. We granted the People's petition for a writ of certiorari to review whether the court of appeals erred in determining that R.D.'s online statements are

15

protected by the First Amendment.[13]  In so doing, we must address the applicable legal standard, which, as the parties' briefs acknowledge, has been the subject of some debate.

## II.  Analysis

¶30    The government's power to regulate speech is constrained by the First Amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I; *see Gitlow v. New York*, 268 U.S. 652, 666 (1925) (incorporating First Amendment against the states).[14]  In this case, R.D. was adjudicated delinquent for conduct that, if committed by an adult, would violate section 18-9-111(1)(e).  At the time, that provision stated as follows:

> (1) A person commits harassment if, with intent to harass, annoy, or alarm another person, he or she . . .
>
> (e) [i]nitiates communication with a person, anonymously or otherwise, by . . . text message, instant message, computer,

---

[13] We granted the People's petition for a writ of certiorari to review the following issue:

> Whether the court of appeals erred in determining that the defendant's comments, made on Twitter, were protected by the First Amendment.

[14] As previously noted, R.D. also raised a claim under Colorado's counterpart to the First Amendment.  *See* Colo. Const. art. II, § 10.  But because he does not argue that a different analysis applies under the state constitution, we discuss only his First Amendment claim.

computer network, or computer system in a manner intended to
. . . threaten bodily injury . . . .

§ 18-9-111(1)(e).[15]

¶31    Because this provision regulates pure speech, we must review the
constitutionality of its application to R.D.'s tweets "with the commands of the First
Amendment clearly in mind." *Watts*, 394 U.S. at 707.

---

[15] The provision was amended effective July 1, 2015, and now reads as follows:

> (1) A person commits harassment if, with intent to harass, annoy, or
> alarm another person, he or she . . .

> (e) Directly or indirectly initiates communication with a person or
> directs language toward another person, anonymously or otherwise,
> by telephone, telephone network, data network, text message, instant
> message, computer, computer network, computer system, or other
> interactive electronic medium in a manner intended to harass or
> threaten bodily injury or property damage, or makes any comment,
> request, suggestion, or proposal by telephone, computer, computer
> network, computer system, or other interactive electronic
> medium that is obscene . . . .

§ 18-9-111(1)(e), C.R.S. (2019).  The Act amending subsection (1)(e) also added a
new subsection (8), which provides that "[section 18-9-111] is not intended to
infringe upon any right guaranteed to any person by the first amendment to the
United States constitution or to prevent the constitutionally protected expression
of any religious, political, or philosophical views."  § 18-9-111(8).  Because R.D.'s
charged conduct predated these alterations to the statutory language, we do not
consider them in our analysis.

17

¶32 The narrow question before us is whether R.D.'s tweets were "true threats."[16]

¶33 To begin, we clarify that the protection of free speech does not vary by medium of expression and, accordingly, we set forth background First Amendment principles and true threats jurisprudence to guide our analysis. Next, we acknowledge that the advent of social media has complicated the constitutional inquiry. To respond to today's changed communication landscape, we both refine our earlier statements of the general framework for distinguishing a true threat from constitutionally protected speech and offer specific guidance for applying that test to statements communicated online.

¶34 Having clarified the test for determining whether R.D.'s online statements constitute true threats, we reverse the judgment of the court of appeals and remand with instructions to return the case to the juvenile court to reconsider the adjudication applying the framework we adopt today.

---

[16] Although the parties' briefs also discuss whether section 18-9-111(1)(e) is facially overbroad, we decline to address this issue, which neither the juvenile court nor the court of appeals addressed or ruled upon, and which, in any event, is beyond the scope of the question on which we granted certiorari review. In other words, we assume for purposes of this opinion that section 18-9-111(1)(e) proscribes only conduct that constitutes a true threat, at least insofar as it criminalizes what R.D. is charged with here. Accordingly, we limit our analysis to whether R.D.'s tweets constituted true threats.

## A. The True Threats Exception

¶35     "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942). "[T]hese areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content*." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992). One such category of unprotected speech is a "true threat."

### 1.  *Watts v. United States*

¶36     The true threats doctrine originated in 1969 with *Watts v. United States*. In that case, which arose during the Vietnam War, the eighteen-year-old defendant was convicted under a federal statute forbidding any person from "knowingly and willfully" making "any threat to take the life of or to inflict bodily harm upon the President of the United States." 394 U.S. at 705. Watts had attended a public anti-war rally on the grounds of the Washington Monument in Washington, D.C., where he joined a scheduled discussion group of young people who were mostly in their teens and early twenties. *Id.* at 705–06. Watts told the group that he had been drafted but would not report for his physical, and an Army Counter Intelligence Corps investigator who was present overheard Watts state, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at

706. Watts and others in the crowd reacted to this statement with laughter. *Id.* at 707.

¶37 The Supreme Court held that the statute under which Watts was convicted was "[c]ertainly . . . constitutional on its face," given the government's overwhelming interest in protecting the safety of the President and allowing him to perform his duties without interference from threats of physical violence. *Id.* But the Court also explained that because the statute "ma[de] criminal a form of pure speech," it had to be "interpreted with the commands of the First Amendment clearly in mind." *Id.* In particular, "a threat must be distinguished from . . . constitutionally protected speech." *Id.* The Court concluded that Watts's statement, "[t]aken in context," including its "expressly conditional nature . . . and the reaction of the listeners," was mere political hyperbole that could not be interpreted as a "true 'threat'" under the statute. *Id.* at 708.

## 2. *Virginia v. Black*

¶38 Thirty-four years later, in *Virginia v. Black*, the Supreme Court reaffirmed that the First Amendment permits states to ban "true threats," which it defined to "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359. The Court also clarified that "[t]he speaker need not actually intend to carry out the threat," because the true

threats exception exists to "protect[] individuals from the fear of violence," "from the disruption that fear engenders," and from "the possibility that the threatened violence will occur." *Id.* at 359–60 (quoting *R.A.V.*, 505 U.S. at 388).

¶39 At issue in *Black* was the constitutionality of a Virginia statute banning cross burning done with intent to intimidate a person or group of persons. *Id.* at 347. One provision of the statute treated cross burning as prima facie evidence of intent to intimidate. *Id.* at 347–48. The Court explained that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360. The Court held that the statute did "not run afoul of the First Amendment insofar as it ban[ned] cross burning with intent to intimidate," *id.* at 361, but a plurality concluded that the provision treating cross burning as prima facie evidence of such intent was overbroad, reasoning that cross burning is sometimes protected expression, *see id.* at 364–67 (plurality opinion).

### 3. The Post-*Black* Debate

¶40 Though *Watts* and *Black* made clear that the First Amendment does not protect a "true threat," the decisions resulted in a split of authority over how to discern whether a particular statement amounts to one.

¶41    A majority of jurisdictions have interpreted *Black*'s definition of a true

threat—a statement where the speaker "means to communicate a serious

expression of an intent to commit an act of unlawful violence"—to require only

that the speaker intended to make the statement.  Under this reading, "means to"

modifies only the word "communicate."  *See, e.g.*, *United States v. Clemens*, 738 F.3d

1, 10 (1st Cir. 2013) (requiring the speaker to intend to make the communication,

but not the threat).  Courts adopting this view judge whether a statement

constitutes a true threat using an objective standard, asking how a reasonable

person would interpret the words.[17]  Proponents of an objective standard have

reasoned that a speaker's lack of intent to threaten does nothing to reduce the

harms identified in *Black* that justify the exception of true threats from First

---

[17] The objective test has several variations, with some courts asking whether the statement is one a reasonable *speaker* would foresee would be interpreted as a serious expression of intention to inflict bodily harm, *see, e.g.*, *State v. Trey M.*, 383 P.3d 474, 478 (Wash. 2016), some asking how a reasonable *listener* would construe the speech in context, *see, e.g.*, *United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012), and some considering both perspectives, *see, e.g.*, *Haughwout v. Tordenti*, 211 A.3d 1, 9 (Conn. 2019) (requiring that "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault" and that "a reasonable listener, familiar with the entire factual context of the defendant's statements, would be highly likely to interpret them as communicating a genuine threat of violence rather than protected expression, however offensive or repugnant" (quoting *State v. Krijger*, 97 A.3d 946, 957, 963 (Conn. 2014))).

Amendment protection. *Black*, 538 U.S. at 359; *see also, e.g.*, *United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012) ("Much like their cousins libel, obscenity, and fighting words, true threats 'by their very utterance inflict injury' on the recipient." (quoting *Chaplinsky*, 315 U.S. at 572)).

¶42　　On the other hand, some courts have interpreted *Black* to require the speaker to have the subjective intent to threaten. Under this reading, "means to" modifies the entire phrase, "communicate a serious expression of an intent to commit an act of unlawful violence."[18] Proponents of a subjective intent requirement have tended to posit that a purely objective listener test would chill protected speech. *See Rogers v. United States*, 422 U.S. 35, 47–48 (1975) (Marshall, J., concurring) (arguing that "charging the defendant with responsibility for the effect of his statements on his listeners . . . would have substantial costs in discouraging the 'uninhibited, robust, and wide-open' debate that the First Amendment is intended

---

[18] *See, e.g.*, *United States v. Heineman*, 767 F.3d 970, 978 (10th Cir. 2014); *United States v. Cassel*, 408 F.3d 622, 631–33 (9th Cir. 2005); *State v. Boettger*, 450 P.3d 805, 813–15 (Kan. 2019); *see also Perez v. Florida*, 137 S. Ct. 853, 855 (2017) (Sotomayor, J., concurring in denial of petition for writ of certiorari) ("Together, *Watts* and *Black* make clear that to sustain a threat conviction without encroaching upon the First Amendment, States must prove more than the mere utterance of threatening words—*some* level of intent is required. . . . These two cases strongly suggest that it is not enough that a reasonable person might have understood the words as a threat—a jury must find that the speaker actually intended to convey a threat.").

23

to protect" (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964))); *United States v. White*, 670 F.3d 498, 525 (4th Cir. 2012) (Floyd, J., concurring in part and dissenting in part) ("Under a purely objective test, speakers whose ideas or views occupy the fringes of our society have more to fear, for their violent and extreme rhetoric, even if intended simply to convey an idea or express displeasure, is more likely to strike a reasonable person as threatening.").[19]

### 4. *Elonis v. United States*

¶43    The U.S. Supreme Court seemed positioned to settle this debate in *Elonis v. United States*, 135 S. Ct. 2001 (2015), where the Court had its first opportunity to apply the true threats doctrine to statements communicated over social media, specifically, posts the petitioner made on Facebook.  There, the petitioner was convicted under a federal statute that makes it a crime to transmit in interstate commerce "any communication containing any threat . . . to injure the person of another."  *Id.* at 2004 (quoting 18 U.S.C. § 875(c) (2018)).  The statute makes no reference to a required mental state.  *Id.* at 2008.  The jury was instructed that to convict Elonis, it had to find that he intentionally communicated a statement that

---

[19] Some have also reasoned that it would be unfair to penalize a speaker for the unintended consequences of their communication.  *See* Leslie Kendrick, *Free Speech and Guilty Minds*, 114 Colum. L. Rev. 1255, 1282 (2014).

a reasonable person would foresee would be regarded by the listener as a threat.[20]

*Id.* at 2004, 2007. The question before the Court was "whether the statute also requires that the defendant be aware of the threatening nature of the communication, and—if not—whether the First Amendment requires such a showing." *Id.* at 2004.

¶44 Ultimately, the Court resolved the case on statutory grounds and did not consider any First Amendment issues. It concluded that reading in only a "reasonable person" standard where a federal criminal statute is silent on the required mental state would be inconsistent with the principle that "wrongdoing must be conscious to be criminal." *Id.* at 2012 (quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952)). The Court held that a defendant's purpose or knowledge would satisfy this requirement but did not address whether recklessness would also be sufficient. *Id.* Justices Alito and Thomas each wrote separately, criticizing the majority's failure to resolve the split in the circuit courts regarding the requisite

---

[20] Specifically, the jury was instructed that

> [a] statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual.

*Elonis*, 135 S. Ct. at 2007.

level of intent. *See id.* at 2014 (Alito, J., concurring in part and dissenting in part) ("Did the jury need to find that Elonis had the purpose of conveying a true threat? Was it enough if he knew that his words conveyed such a threat? Would recklessness suffice? The Court declines to say. Attorneys and judges are left to guess."); *see id.* at 2018 (Thomas, J., dissenting) ("[The majority's] failure to decide throws everyone from appellate judges to everyday Facebook users into a state of uncertainty."). Thus, after *Elonis*, the proper test for true threats remains an unsolved doctrinal puzzle.

¶45 A definitive framework for discerning a true threat has been similarly elusive in Colorado, though our appellate courts have tended to embrace some form of an objective test. For example, in *People v. Baer*, 973 P.2d 1225 (Colo. 1999), this court appeared in passing to endorse a reasonable speaker test, parenthetically describing a true threat as "one which a reasonable person would foresee would be interpreted by the recipient as a serious threat to inflict death or bodily injury." *Id.* at 1231. And in an earlier, widely cited special concurrence in *People v. Janousek*, 871 P.2d 1189 (Colo. 1994), then-Justice Mullarkey described the "critical inquiry" under true threats jurisprudence as more of a reasonable listener test: "whether those who hear or read the threat reasonably consider that an actual threat has been made." *Id.* at 1198 (Mullarkey, J., specially concurring); *see also R.D.*, ¶ 10 (reciting *Janousek* concurrence formulation); *Stanley*, 170 P.3d at 787 (same);

26

*McIntier*, 134 P.3d at 472 (same).  More recently, the court of appeals division in *Stanley* specifically rejected the contention that *Black* required more than an objective test.  *See* 170 P.3d at 786–89.

### B.  Distinguishing True Threats from Protected Speech in the Age of Social Media

¶46    This court has not had occasion to revisit the framework for assessing whether a statement is a true threat since the U.S. Supreme Court issued its 2003 decision in *Black*.  And as this case demonstrates, the ways in which technology has transformed our everyday communication complicates the constitutional inquiry.  We take this opportunity to refine our test for discerning whether a statement is a true threat, taking into account this altered communication landscape.

¶47    First, it is foundational that the "'basic principle[] of freedom of speech, . . . like the First Amendment's command, do[es] not vary' when a new and different medium for communication appears."  *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).  That said, "[e]very medium of expression presents special First Amendment problems which must be examined in the light of the circumstances which are interwoven with the speech in issue."  *People v. Weeks*, 591 P.2d 91, 95 (Colo. 1979) (citing *Joseph Burstyn, Inc.*, 343 U.S. at 502–03, and *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949) (Jackson, J., concurring)).  In this case, we are alert to the

competing concerns that "[s]ocial media make hateful and threatening speech more common but also magnify the potential for a speaker's innocent words to be misunderstood." Lyrissa Barnett Lidsky & Linda Riedemann Norbut, *#I🔫U: Considering the Context of Online Threats*, 106 Calif. L. Rev. 1885, 1885 (2018).

¶48 Words communicated online and without the interpretive aid of body language are easily misconstrued. Indeed, our reliance on nonverbal cues was implicit in *Chaplinksy*, where the U.S. Supreme Court first articulated the "fighting words" doctrine. There, the Court recognized that "[t]he English language has a number of words and expressions which by general consent are 'fighting words' when said *without a disarming smile*." 315 U.S. at 573 (emphasis added) (quoting *State v. Chaplinsky*, 18 A.2d 754, 762 (N.H. 1941)). Modern replacements for such cues, like emojis and gifs, often lack standard meaning and can be difficult to interpret. Complicating things further, emojis may look different depending on the sender's or recipient's operating system. For one example, an emoji that resembles a toy squirt gun in a message sent on one platform may appear as a revolver on a recipient device. *Cf.* Lidsky & Norbut, *supra*, at 1908 (explaining that the gun emoji in the article's title "looks like a space pistol on some platforms and like a revolver on others").

¶49 The chance of meaning being lost in translation is heightened by the potential for online speech to be read far outside its original context. These days,

one needs no more than a whim and a smartphone to broadcast to a massive audience. A message posted in Denver can reach New York, Tokyo, or Munich in an instant. Indeed, the term "viral" is apt for the rapidity with which an online statement can spread. A recipient might retransmit a message to audiences not foreseeable to the original speaker. A message might be recirculated after an intervening event that alters its impact. And online speech transmitted in the heat of the moment—which, if uttered verbally, would not linger beyond the speaker's apology—might be archived and subjected to scrutiny years after the fact.

¶50 The risk of mistaking protected speech for a true threat is high. But so are the stakes of leaving true threats unregulated. With the click of a button or tap of a screen, a threat made online can inflict fear on a wide audience. *See, e.g.*, Julie Turkewitz & Jack Healy, *'Infatuated' with Columbine: Threats and Fear, 20 Years After a Massacre*, N.Y. Times (Apr. 17, 2019), https://www.nytimes.com/2019/04/17/us/columbine-shooting-sol-pais.html (reporting that "millions of parents, students, and educators across Colorado" awoke on Columbine's 20th anniversary to news of an individual's alarming social media posts and threats to friends and family, and that hundreds of schools across the state closed in response). Indeed, a single online post can trigger the diversion of significant law enforcement resources. *See, e.g.*, *United States v. Bradbury*, 848 F.3d 799, 802 (7th Cir. 2017) (observing that defendant's Facebook post

precipitated an extensive police investigation).  Or such a threat may be directed to a known and vulnerable victim in the privacy of their home.  *See Elonis*, 135 S. Ct. at 2017 (Alito, J., concurring in part and dissenting in part) ("Threats of violence and intimidation are among the most favored weapons of domestic abusers, and the rise of social media has only made those tactics more commonplace.").    Online communication—in particular, the ability to communicate anonymously—enables unusually disinhibited communication, magnifying the danger and potentially destructive impact of threatening language on victims.  *See Reno v. ACLU*, 521 U.S. 844, 889 (1997) (O'Connor, J., concurring) ("[C]yberspace allows speakers and listeners to mask their identities.").  In short, technological innovation has provided apparent license and a ready platform to those wishing to provoke terror.

¶51     Given this changed landscape, we are convinced that the various objective tests previously articulated by this court and the court of appeals are insufficient to distinguish "what is a [true] threat . . . from what is constitutionally protected speech." *Watts*, 394 U.S. at 707.  Judging a statement from the vantage point of a "reasonable speaker" or "reasonable listener," in our view, inadequately accounts for potentially vast differences in speakers', listeners', and disinterested fact-finders' frames of reference. We therefore hold that a true threat is a statement that, considered in context and under the totality of the circumstances, an intended

or foreseeable recipient would reasonably perceive as a serious expression of intent to commit an act of unlawful violence.[21] We believe that this refinement of the objective standard strikes a better balance between giving breathing room to free expression and protecting against the harms that true threats inflict.

¶52 In determining whether a statement is a true threat, a reviewing court must examine the words used, but it must also consider the context in which the statement was made. Particularly where the alleged threat is communicated online, the contextual factors courts should consider include, but are not limited to (1) the statement's role in a broader exchange, if any, including surrounding events; (2) the medium or platform through which the statement was communicated, including any distinctive conventions or architectural features; (3) the manner in which the statement was conveyed (e.g., anonymously or not, privately or publicly); (4) the relationship between the speaker and recipient(s); and (5) the subjective reaction of the statement's intended or foreseeable recipient(s).

---

[21] In the absence of additional guidance from the U.S. Supreme Court, we decline today to say that a speaker's subjective intent to threaten is necessary for a statement to constitute a true threat for First Amendment purposes. But even assuming that the First Amendment requires proof of such subjective intent, the statute here required the government to show beyond a reasonable doubt that R.D. "initiate[d] communication . . . in a manner intended to . . . threaten bodily injury." § 18-9-111(1)(e).

¶53    Courts should start, of course, with the words themselves, along with any accompanying symbols, images, and other similar cues to the words' meaning. *Cf. United States v. Edwards*, No. 2:17-CR-170, 2018 WL 456320, at *2 (S.D. Ohio Jan. 17, 2018) (in witness retaliation case, analyzing Facebook post that called confidential informant a snitch and included laughing faces and a skull emoji). This inquiry should include whether the threat contains accurate details tending to heighten its credibility. *See, e.g.*, *Elonis*, 135 S. Ct. at 2005–06 (noting the accuracy of the details in defendant's Facebook post conveying a threat against his wife, including a diagram of her house and directions to "fire a mortar launcher . . . from the cornfield behind it because of easy access to a getaway road" and "a clear line of sight through the sun room"). It should also examine whether the speaker said or did anything to undermine the credibility of the threat. *See, e.g.*, *Watts,* 394 U.S. at 707–08 (noting that petitioner's threat to kill the President was made conditional upon induction into the Armed Forces, an event petitioner vowed would never occur).

¶54    Importantly, "what a defendant actually said is just the beginning of a threats analysis." *Haughwout v. Tordenti*, 211 A.3d 1, 11 (Conn. 2019). For example, a veiled statement may carry a true threat. *See, e.g.*, *Jeffries*, 692 F.3d at 482 ("[O]ne cannot duck [a threats prosecution] merely by delivering the threat in verse or by dressing it up with political (and protected) attacks on the legal system."); *Planned*

32

*Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1062–63 (9th Cir. 2002) (en banc) (concluding that, viewed in context, "Wanted"-style posters listing the names of doctors who had performed abortions could be true threats); *cf. Elonis*, 135 S. Ct. at 2015 (Alito, J., concurring in part and dissenting in part) ("To hold otherwise would grant a license to anyone who is clever enough to dress up a real threat in the guise of rap lyrics, a parody, or something similar."). On the other hand, words that are threatening on their face may actually be just creative expression, jest, or hyperbole. *See, e.g., Jeffries*, 692 F.3d at 482 ("[A] song, a poem, a comedy routine or a music video is the kind of context that may undermine the notion that the threat was real."); *Burge v. Colton Sch. Dist. 53*, 100 F. Supp. 3d 1057, 1060, 1069 (D. Or. 2015) (concluding eighth grader's comment on Facebook that a teacher at school "need[ed] to be shot" was reasonably understood to be merely a critique of the teacher's skills); *State v. Boettger*, 450 P.3d 805, 818 (Kan. 2019) (imagining a police protester standing near police officers and quoting the lyrics of N.W.A.'s "Fuck tha Police," (Straight Outta Compton (Ruthless/Priority 1989)), "[t]ak[e] out a cop or two"). In short, words matter. But so does context.

¶55 Particularly when evaluating online communication, courts should consider whether the statement was part of a larger exchange, including surrounding events. If so, the court should take note of the overall tone of that conversation, as

well as the origin of the allegedly threatening language—for example, whether it was spontaneous or responsive to some other communication. It should also consider how surrounding events may impact the statement's tenor. *United States v. Voneida*, 337 F. App'x 246, 248 (3d Cir. 2009) (concluding that recency of Virginia Tech shooting supported finding that student's posts to his MySpace page, including that "[s]omeday [he would] make the Virginia Tech incident look like a trip to an amusement park," were true threats). *But see Watts*, 394 U.S. at 711 (Douglas, J., concurring) (noting danger of policing alleged threats "under circumstances when intolerance for free speech [is] much greater than it normally might be" (quoting Note, *Threatening the President: Protected Dissenter or Political Assassin*, Geo. L. J. 553, 570 (1969))).

¶56 Relatedly, the court should consider the medium or platform used to communicate the alleged threat. First, the choice of medium itself may be revealing. *See, e.g.*, *United States v. Bagdasarian*, 652 F.3d 1113, 1120–21 (9th Cir. 2011) (reasoning that posting violent messages about the President on financial message board blunts the perception that the statements are true threats). And evidence regarding prevailing norms in a particular genre or even internet subforum may also help recast violent language in a less threatening light. *See, e.g.*, *Bell v. Itawamba Cty. Sch. Bd.*, 774 F.3d 280, 301 (5th Cir. 2014) (noting that "hyperbolic and violent language is a commonly used narrative device in rap,

which functions to convey emotion and meaning—not to make real threats of violence"). In the context of social media, the court should also consider the platform's distinctive architectural features, *cf. Unsworth v. Musk*, No. 2:18-CV-08048-SVW-JC, 2019 WL 4543110, at *6–7 (C.D. Cal. May 10, 2019) (in defamation case, reasoning that Twitter's 280-character limit rendered dubious the notion that short-hand supports an inference that text in question was opinion rather than fact), and conventions, *see, e.g.*, *Matter of Welfare of A.J.B.*, 929 N.W.2d 840, 844 (Minn. 2019) (distinguishing direct messages from mentions on Twitter).

¶57 The manner in which the statement was conveyed may also provide insight. For example, "a speaker's anonymity could influence a listener's perception of danger." *Bagdasarian*, 652 F.3d at 1120–21 (but concluding there was no reason in that case to think the speaker's anonymity made it more, rather than less, likely that a violent post regarding the President was a serious threat). The directness of the message may also be revealing. *See, e.g.*, *Elonis*, 135 S. Ct. at 2016 (Alito, J., concurring in part and dissenting in part) ("'Taken in context,' lyrics in songs that are performed for an audience or sold in recorded form are unlikely to be interpreted as a real threat to a real person," whereas "[s]tatements on social media that are pointedly directed at their victims . . . are much more likely to be taken seriously."); *A.J.B.*, 929 N.W.2d at 865 (Chutich, J., concurring in part and dissenting in part) (reasoning that accused's having posted a "tweet storm of 40

35

posts, all of which specifically tagged [the target's] Twitter handle," supported a finding of malicious intent).

¶58    Courts should also consider the speaker's familiarity with the recipients or targets of the threat and the nature of the relevant parties' personal history.  For example, in *Elonis*, the defendant's alleged threats included lyrics posted to Facebook that threatened violence against his wife soon after she left him and took with her their two children.  135 S. Ct. at 2004.  Relatedly, courts should consider whether a threat's intended recipient or target is particularly vulnerable, whether because of personal characteristics or the parties' relationship.  *See, e.g., A.J.B.*, 929 N.W.2d at 844 (considering "an unrelenting torrent of cruel tweets at . . . an individual diagnosed with autism and Attention Deficit Hyperactivity Disorder" encouraging the target to commit suicide).

¶59    Finally, the subjective reaction of a statement's target or foreseeable recipients will be an important clue as to whether the message is a true threat. *See, e.g., Watts,* 394 U.S. at 708 (reasoning that in part because of listeners' laughing response, defendant's statement could not be interpreted as true threat).  This inquiry need not be limited to the recipient's immediate reaction. *See, e.g., D.J.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 758, 764 (8th Cir. 2011) (teenage recipient of threats via instant message initially responded "lol" —shorthand for "laughing out loud" —but was concerned enough to tell trusted adult); *Haughwout*,

36

211 A.3d at 14 (observing that some students initially "elected to treat [the remarks at issue] as made in jest," but that "some of those same students nevertheless were sufficiently perturbed to contact the university police").

¶60 That said, courts should be wary of placing significant weight on the subjective reaction of a statement's *unintended* recipients. To do so risks punishing a speaker for the content of a message that has been decoupled from its context. This is of heightened concern given the vast temporal, geographic, and cultural distance current technology permits speech to travel. We are mindful that someone who stumbles upon a message he perceives as threatening may experience sincere fear and anxiety. But to construe the true threats exception to protect every passive internet user from the risk of such harms gives the doctrine too wide a scope.

¶61 Moreover, a listener's subjective reaction, without more, should not be dispositive of whether a statement is a true threat. We acknowledge that the true threats exception serves to protect individuals from "the fear of violence," and "from the disruption that fear engenders." *R.A.V.*, 505 U.S. at 388. But whether a particular reader or listener will react with fear to particular words is far too unpredictable a metric for First Amendment protection. Such a rule would not give sufficient "breathing space" to the freedom of speech. *Cf. Chaplinsky*, 315 U.S.

at 573 ("The word 'offensive' is not to be defined in terms of what a particular addressee thinks." (quoting *Chaplinsky*, 18 A.2d at 762)).

¶62   The factors discussed here are not meant to constitute an exhaustive list. Depending on the facts and circumstances, other considerations may be relevant to the overarching goal of examining a statement in all its context to discern whether it is a true threat or protected expression. Relatedly, the fact-finder has discretion to weigh each factor in the balance, and to decide whether a particular factor cuts for or against finding a true threat. Finally, in considering each factor, courts may find it helpful to admit expert testimony to help illuminate coded meanings, explain community norms and conventions, or bridge other contextual gaps.

## III.  Application

## A.  Standard of Review

¶63   Whether a particular statement constitutes a true threat is an issue of fact to be determined by the fact finder in the first instance. *People v. Chase*, 2013 COA 27, ¶ 70, 411 P.3d 740, 754; *State v. Johnston*, 127 P.3d 707, 712 (Wash. 2006). But in First Amendment speech cases, an appellate court must make an independent examination of the record to assure itself that the judgment does not impermissibly intrude on the field of free expression. *Chase*, ¶ 70, 411 P.3d at 754. Thus, whether

a statement constitutes a true threat is a matter subject to independent review. *Johnston*, 127 P.3d at 712.

## B. R.D.'s As-Applied Challenge

¶64 It is unclear from the record what standard the trial court applied in concluding that R.D.'s "particular type of speech is not protected under the First Amendment." The court heard argument from counsel but took no evidence on that question. Moreover, the trial transcript reveals that the court did not reconsider R.D.'s constitutional argument at the close of the prosecution's case or in the final ruling adjudicating R.D. delinquent. And in judging R.D.'s tweets against the elements of section 18-9-111(1)(e), the trial court actively disregarded testimony suggesting that A.C. and J.W. did not take R.D.'s messages seriously, considering their reaction irrelevant under the statute. As stated above, their reaction was a relevant factor to consider under the First Amendment.

¶65 Because we have clarified the test to be used when evaluating whether a statement constitutes a true threat, the trial court is in the best position to review the record, to take further evidence in its discretion, and to reach a conclusion on the matter.

## IV. Conclusion

¶66 We hold that a true threat is a statement that, considered in context and under the totality of the circumstances, an intended or foreseeable recipient would

reasonably perceive as a serious expression of intent to commit an act of unlawful violence.  In determining whether a statement is a true threat, a reviewing court must examine the words used, but it must also consider the context in which the statement was made.  Particularly where the alleged threat is communicated online, the contextual factors courts should consider include, but are not limited to (1) the statement's role in a broader exchange, if any, including surrounding events; (2) the medium or platform through which the statement was communicated, including any distinctive conventions or architectural features; (3) the manner in which the statement was conveyed (e.g., anonymously or not, privately or publicly); (4) the relationship between the speaker and recipient(s); and (5) the subjective reaction of the statement's intended or foreseeable recipient(s).

¶67    We agree with the parties that in this case, the government must also prove that R.D. had the subjective intent to threaten.  We need not decide today whether the First Amendment requires that showing in every threats prosecution.

¶68    Because neither the juvenile court nor the court of appeals had the benefit of the framework we adopt today, we reverse the judgment of the court of appeals and remand with instructions to return the case to the juvenile court to reconsider the adjudication applying this refined test.