IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-164

No. 156PA20

Filed 17 December 2021

STATE OF NORTH CAROLINA

v.

DAVID WARREN TAYLOR

Appeal pursuant to N.C.G.S. § 7A-31 from a unanimous decision of the Court of Appeals, 270 N.C. App. 514, vacating the judgment entered 23 January 2018 by Judge Gary M. Gavenus in Superior Court, Macon County. Heard in the Supreme Court on 24 March 2021.

*Joshua H. Stein, Attorney General, by Nicholas S. Brod, Assistant Solicitor General, and Ryan Y. Park, Solicitor General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Aaron Thomas Johnson, Assistant Appellate Defender, for the defendant-appellee.*

MORGAN, Justice.

¶ 1     On 24 August 2016, defendant David Warren Taylor posted a string of angry comments on his personal Facebook social media page. The messages conveyed defendant's forceful disagreement with a decision by the area's elected District Attorney, Ashley Welch, not to criminally prosecute the parents of a child after the youngster's death under unusual circumstances in Macon County. During the diatribe, defendant consumed an unspecified, but apparently significant, quantity of

beer. Most of defendant's posts contained pointed, inflammatory, but essentially political critiques of District Attorney Welch and various aspects of the Macon County judicial system.[1]

¶ 2    Some of the posts contained troubling language. In one of them, defendant promised that District Attorney Welch "will be the first to go" when a purportedly impending "rebellion against our government" occurs. In another comment, defendant declared that "[i]f [District Attorney Welch] won't do anything, then the death to her as well." Defendant also made numerous references to the firearms that he owned and his willingness to use them against law enforcement officers if he were ever "raided."

¶ 3    Within a couple of hours of publishing his final Facebook message, defendant reconsidered the wisdom of broadcasting his unadulterated opinions on social media, in what has been called "the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). However, before defendant could delete the rant from his Facebook page, one of his Facebook "friends"—a detective in the Macon County Sheriff's Office—became concerned that the messages harbored content more sinister than intemperate venting. The detective took screenshots of defendant's posted comments and sent them to District Attorney Welch and the Macon County Sheriff,

---

[1] For proper attribution, I recognize and appreciate the significant contribution which Justice Earls has made to the introductory overview, the "Background," and the "Analysis" segments of this opinion.

who then contacted the North Carolina State Bureau of Investigation (SBI). The next day, SBI investigators interviewed defendant at his office. That afternoon, defendant was arrested and later indicted under N.C.G.S. § 14-16.7(a) for "knowingly and willfully" threatening to kill a court officer. N.C.G.S. § 14-16.7(a) (2019). Defendant was subsequently convicted of the charged offense. He received a suspended sentence of 24 months of supervised probation and a $1,000 fine. Defendant appealed, and the Court of Appeals concluded that his conviction violated the First Amendment. The State has appealed to this Court.

¶ 4    At its core, this case presents a single question: Does the Free Speech Clause of the First Amendment to the United States Constitution[2] protect defendant from being convicted solely for publishing the messages contained in his Facebook posts? We conclude that it does, and therefore determine that his messages are shielded by the First Amendment. Accordingly, while the Court of Appeals was correct to vacate defendant's conviction, there remain questions for a properly instructed jury, so we reverse and remand the matter for a new trial.

## I.    Background

### A. The Facebook posts

¶ 5    Defendant and Welch were familiar with one another prior to the events which

---

[2] This pertinent portion of the First Amendment states: "Congress shall make no law . . . abridging the freedom of speech or of the press. . . ." U.S. Const. amend I.

spawned this case. Defendant was a Macon County resident who supported Welch in her campaign for the elected office of District Attorney. Defendant worked in an office building which was close to the Macon County Courthouse where the two occasionally would see each other during work breaks. Defendant and Welch were friendly, even though their conversations often centered on "political" subjects.

¶ 6    Defendant's favorable view of District Attorney Welch changed on 24 August 2016 when he learned that she would not be pursuing criminal charges against the parents of a Macon County child who had died a few months earlier. Defendant's concerns were rooted in the tragic details of the child's death. According to the parents, the two-and-a-half-year-old boy had "some sniffles" when they tucked him in for a nap. When the parents returned, the youngster was not breathing. The parents claimed that they took their son directly to the hospital, but when they arrived at the emergency room, the child was already deceased and "incredibly decomposed." Welch was concerned that the child had been "killed or neglected," and consequently ordered an autopsy. To Welch's surprise, the parents' account was confirmed. The autopsy determined that the child's death and subsequent rapid physical decomposition did not result from any maltreatment or abuse. Lacking evidence of criminal conduct, Welch declined to press charges against the child's parents.

¶ 7    When defendant learned of District Attorney Welch's decision to refrain from

indicting the parents, he was demonstrably skeptical. He described the representation that the child had "died of a virus" as "a load of "F**king shit." Defendant utilized the social media site Facebook as the primary vehicle by which to express his frustration. Defendant initiated a litany of comments on his assessment of the situation with the following Facebook entry:[3]

> [Defendant]: So I learned today that the couple Who brought their child Into that er whom had been dead to the point that the er room had to be closed off due to the smell of the dead child Will face no Charges. I regret the day I voted for the new DA with this outcome. This is totally sickening to know that a child, whether by Ashley Welch's decision or not is not granted this type of Protection in our court system. Im tired of standing back and seeing how our judicial system works. I voted for it to change and apparently it never will. With this people question why a rebellion against our government is coming? I hope those that are friends with her share my post because she will be the first to go, period and point made.

In response, a few of defendant's Facebook friends communicated their shared agreement with defendant's views. Defendant himself then resumed his commentary:

> [Defendant]: Sick is not the word for it. This folks is how the government and the judicial system works, Now U wonder why I say if I am raided for whatever reason like the guy on smoke rise was. When the deputy ask me is it worth it. I would say with a Shotgun Pointed at him and a ar15 in the other arm was it worth to him? Who cares what happens to the person I meet at the door. I'm sure he won't. I would open every gun I have. I would rather be carried by six than judged by twelve. This folks is how politicians

---

[3] Given the subject matter of this case and the relevance of defendant's exact posting, we have only minimally altered his quotes to ensure they are understandable.

> want u to believe is ok. Im tired of it. What I do Training wise from this point is ur fault. And yes I know I have friends on [Facebook] whom see this. I hope they do! Death to our so called judicial system since it only works for those that are guilty! U want me come and take me.

When one of his Facebook friends expressed surprise that these events could occur in Macon County, defendant responded, "This is how politics works. That's why my harsh words to her and any other that will Listen and share it To her [Facebook] page." Another member of defendant's Facebook network called for "vigilante justice," which was punctuated by markedly numerous exclamation marks. Defendant replied:

> If that what it takes[.] I will give them both the [mountain] justice they deserve. Regardless of what the law or courts say. I'm tired of this political bullshit. If our head prosecutor won't do anything then the death to her as well. Yea I said it. Now raid my house for communicating threats and see what they meet. After all those that flip Together swim together. Although this isn't a house or pond they want to fish in.

The author of the "vigilante justice" comment posted that he was "still waiting."

Again, defendant responded:

> For what [ ]? [District Attorney Welch] to reply? She won't because she is being paid a 6 digit income standing Outside the courthouse smoking a cigarette. She won't try a case unless it gets her TV time. Typical politician. Notice that none of them has responded yet? Although I'm sure My house is being Monitored right about now! I really hope They are ready for what meet them at the front door. Something tells Me they aren't!

As other Facebook observers continued to "like" his posts and comment on them,

defendant published four more messages:

> It can start at my house. Hell this has to start somewhere. If the courts won't do it as have been proven. Then yes it Is up to the people to administer justice! I'm always game to do so. They make new ammo everyday! Maybe you need to learn what being free is verse being a puppet of the government. If u did u would might actually be happy! I think we both know of someone who will like this Comment Or Like this post.
>
> I know people who said the er room had to be shut down because the smell of they dead kid stunk up the entire er room. Our DA and Police department chose not to press charges. Yea that's the facts. Welcome to America. The once great great nation.
>
> Don't get me started on this. The court system and Most importantly western nc justice system is useless. It's all about money to the courts than it Is about justice. It is time for old Time mtn justice! Yes [ ] I said it. Now let Them knock on my door.
>
> [ ] don't get me Started about The Tony Curtis killing. Of Course No charges will Be brought against him. He is what the county considers to be a upstanding citizen of the community. Typical politics at its best. What he did was no different to the killing On 411 north over a year ago. What was his name? Fouts?

¶ 8     On the following day of 25 August 2016, the Macon County Sheriff's Office, the

Macon County Courthouse, and District Attorney Welch herself all took precautions

to ensure her safety. Additional deputies were stationed within and around the

courthouse. Welch stopped walking through the office building where defendant

worked. Further, she asked a realtor who had posted a video tour of Welch's home to

remove the video, fearing that it could reveal identifying information from which defendant could glean Welch's address.

¶ 9 Later in the same day, a Special Agent from the SBI went to defendant's workplace to interview defendant. During the meeting, defendant reiterated his complaint that "no charges were brought against the parents" of the child who died, which defendant described as "sickening." Defendant claimed that he did not mean to threaten or harm District Attorney Welch and that he deleted the social media posts because "he was friends with someone on Facebook who was friends with the parents' children." He then apologized for any concern that his posts had raised and asked the SBI agent to tell Welch that defendant was sorry.

¶ 10 Shortly after the interview concluded, police arrested defendant at his place of employment. Defendant was subsequently indicted pursuant to N.C.G.S. § 14-16.7(a) for "knowingly and willfully mak[ing] a[ ] threat to inflict serious bodily injury upon or to kill a[ ] . . . court officer[.]"

**B. The trial**

¶ 11 Defendant's trial began in January 2018. After the State concluded the presentation of its case, defendant moved to dismiss the matter on First Amendment grounds. He argued that the State had not shown that he had communicated any "true threat" against District Attorney Welch, which he contended was a threshold requirement in order to obtain a criminal conviction under N.C.G.S. § 14-16.7(a),

consistent with First Amendment protections. Defendant defined a true threat as "a statement in which the defendant means to communicate a serious intention of committing an act of unlawful violence against a particular person." The trial court denied defendant's dismissal motion. Defendant did not elect to present evidence on his own behalf. He renewed his motion to dismiss on First Amendment grounds at the close of all of the evidence, which the trial court again denied.

¶ 12    During the jury charge conference, defendant requested jury instructions which distinguished "political hyperbole" from "true threats," based on his contention that the First Amendment forbade his conviction in the event that the jury could not find that he had communicated a true threat. The State objected to the proposed instruction, as it asserted that the "proper venue" and time for defendant to raise any First Amendment arguments would be "if upon conviction to take that up on appeal." The State also argued that the First Amendment was irrelevant because N.C.G.S. § 14-16.7(a) reflected the General Assembly's determination that "making any threats towards . . . court officials . . . is unacceptable." In the State's view, defendant's proposed jury instructions would impermissibly "rewrite [N.C.G.S. § 14-16.7(a)] to comport with his interpretation of the First Amendment requirements." Instead, the State asked the trial court to instruct the jury in accordance with the language of the statute, proposing an instruction which contained the phrase that there was "no requirement of proof to show that the threat was made in a manner

and under circumstances which would cause a reasonable person to believe it is likely to be carried out." The trial court agreed with the State's stance and therefore instructed the jury that in order to convict defendant, the State only needed to prove that defendant "knowingly and willfully made a threat to kill the alleged victim."

¶ 13    The jury found defendant guilty of the charged offense. The trial court sentenced defendant to a term of incarceration of 6 to 17 months, which was suspended upon 24 months of supervised probation and payment of a fine of $1,000.00. Defendant appealed.

**C. The Court of Appeals opinion**

¶ 14    Upon defendant's appeal, the Court of Appeals panel unanimously agreed that the First Amendment required the State to prove that defendant communicated a true threat. *State v. Taylor*, 270 N.C. App. 514, 517 (2020). In vacating the verdict and judgment entered against defendant at trial, the lower appellate court also unanimously agreed that N.C.G.S. § 14-16.7(a) was unconstitutional as applied to convict defendant for his Facebook posts. *Id.* The Court of Appeals concluded that the State was required to prove that defendant possessed both a general and specific intent to threaten District Attorney Welch in order to establish that defendant had communicated a true threat. In so concluding, the Court of Appeals held that in order to prove that defendant communicated a true threat, the State was required to prove that he communicated a statement which was *objectively threatening* and that he

*subjectively intended* to threaten District Attorney Welch when he posted the messages on Facebook.[4] The State needed to establish the objective component that defendant's statements "would be understood by people hearing or reading it in context as a serious expression of an intent to kill or injure" District Attorney Welch and that defendant "intended that the statement be understood as a threat" in order to satisfy the subjective component. *Id.* at 557 (quoting *United States v. Bagdasarian*, 652 F.3d 1113, 1118 (9th Cir. 2011)). The State failed, in the view of the Court of Appeals, to prove the existence of either prong because (1) defendant's Facebook posts were "simply not [ ] statement[s] that a reasonable person would understand as Defendant expressing a *serious intent to kill* D.A. Welch," and (2) "the record evidence could not have supported a finding that Defendant's intent in posting his comments was to cause D.A. Welch to believe Defendant was going to kill her." *Id.* at 581.[5] The

---

[4] For ease of reading, we use the terms "objective" and "subjective," and their derivatives, throughout this opinion, rather than the terms "general intent" and "specific intent," to refer to the two elements that defendant alleges that the State must prove in order to convict him for communicating a true threat.

[5] Additionally, the Court of Appeals held that the First Amendment's "true threats" requirement was an essential element of N.C.G.S. § 14-16.7(a). Because "[i]t is well established that a defendant cannot receive a fair, i.e., constitutional, trial, unless *all* essential elements of the crime charged are submitted to the jury and found beyond a reasonable doubt," the lower appellate court concluded that the trial court's failure to give any instruction incorporating First Amendment requirements rendered defendant's conviction as constitutionally infirm. *Taylor*, 270 N.C. App. at 541. The State has conceded this point and agrees that defendant's conviction must be vacated. Accordingly, the only question before this Court is whether to affirm the Court of Appeals decision vacating the trial court judgment and remanding for entry of a judgment of acquittal, or to reverse the Court of Appeals decision, vacate the trial court's judgment, and remand for a new trial.

Court of Appeals majority ultimately adopted defendant's argument that his social media messages were protected by the First Amendment because the State did not prove that defendant communicated a true threat against the elected official Welch.

¶ 15        In a concurring opinion, a member of the Court of Appeals panel reached the same outcome in the case as the majority of the panel did, concluding as a matter of law that defendant's messages were not objectively threatening. *Id.* at 591 (Dietz, J. concurring in part).

¶ 16        We granted the State's petition for discretionary review.

## II.    Analysis

### A. Applicable free speech principles

¶ 17        The Free Speech Clause of the First Amendment, as incorporated to apply to the states through the Due Process Clause of the Fourteenth Amendment, provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This provision serves as a bulwark against governmental action which threatens the robust exchange of ideas that is "the indispensable condition[ ] of nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 327 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1969). Laws restricting speech "because of disapproval of the ideas expressed" are typically unconstitutional. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992); *see also Regan v. Time, Inc.*, 468 U.S. 641, 648–49 (1984) ("Regulations which permit the

Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment."). "Content-based regulations"—including criminal statutes which target speech on the basis of its content—"are presumptively invalid." *R.A.V.*, 505 U.S. at 382.

¶ 18        However, "our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas." *Id.* at 382–83. Certain categories of expression "can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content.*" *Id.* at 383. These "constitutionally proscribable" categories of expression include obscenity, *Miller v. California*, 413 U.S. 15 (1973), defamation, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), incitement, *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and true threats, *Watts v. United States*, 394 U.S. 705 (1969). If defendant's Facebook posts contained any true threats, then it is indisputable that he could be criminally punished for the content of his messages, provided that "the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *R.A.V.*, 505 U.S. at 388. If Taylor's Facebook posts did not contain any true threats, then his expression is shielded by the First Amendment. We are therefore compelled to identify the characteristics of true threats which allow the State to prosecute one kind of expression understood to be entirely lacking in constitutional value, while

preventing N.C.G.S. § 14-16.7(a) from "becoming an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks' which must be protected if the guarantees of the First and Fourteenth Amendments are to prevail." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Speakers need clarity on the type of communication which constitutes a true threat so that they can engage in protected First Amendment activities while ensuring their speech is lawful.

¶ 19        Neither this Court nor the Supreme Court of the United States has ever explicitly defined the scope of the true threats exception to the First Amendment. However, our analysis is guided by the high court's articulation of general principles in the few cases addressing the existence of true threats which it has decided, as well as the many cases involving other categories of constitutionally forbidden speech.

¶ 20        As the Supreme Court of the United States has repeatedly emphasized, when tasked with drawing the boundary line between constitutionally protected speech and criminally proscribable expression, the risk of hampering public debate should be a court's foremost concern. "Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands . . . an area of breathing space so that protected speech is not discouraged." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989) (extraneity omitted). This demand for "breathing space" is especially pronounced when governmental action risks targeting

or dissuading "[s]peech concerning public affairs," which is "more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). *See also Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 457 (2007) ("In drawing that line [between protected and proscribable expression], the First Amendment requires us to err on the side of protecting political speech rather than suppressing it."). To assure adequate "breathing space," the Court has "narrowed the scope of the traditional categorical exceptions" to the First Amendment, even though the Court continues to recognize their existence. *R.A.V.*, 505 U.S. at 383.

In deciding whether the First Amendment allows defendant to be convicted under N.C.G.S. § 14-16.7(a) for his Facebook posts, we "interpret the language that [the General Assembly] chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' " *Watts v. United States*, 394 U.S. 705, 708 (1969) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The various cases which expound upon this principle convey a clear message that we must avoid a definition of the true threats exception to the First Amendment which sweeps too broadly. Unduly enlarging any categorical exception to the First Amendment "would have substantial costs in discouraging the uninhibited, robust, and wide-open debate that the First Amendment is intended to protect." *Rogers v. United States*, 422 U.S. 35, 48

(1975) (Marshall, J., concurring) (extraneity omitted). Our examination and interpretation of the limited case law expressly addressing the true threats doctrine must respect and revere these fundamental First Amendment principles.

### 1. *The true threats exception*

The Supreme Court of the United States first recognized the true threats exception to the First Amendment in *Watts v. United States*. In *Watts*, the defendant—an eighteen-year-old Black protestor—attended a rally at the Washington Monument, where he participated in a discussion group about police brutality. 394 U.S. at 706. During this discussion, the defendant declared that

> I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. *If they ever make me carry a rifle the first man I want to get in my sights is [President Lyndon Baines Johnson].*[6] They are not going to make me kill my black brothers.

*Id.* (extraneity omitted) (emphasis added). Befitting the era, one member of the discussion group was an investigator from the Army Counter Intelligence Corps. *Id.* The next day, the defendant was arrested by Secret Service agents. He was ultimately indicted and convicted under a federal statute which prohibited individuals from "knowingly and willfully . . . (making) any threat to take the life of or to inflict bodily harm upon the President of the United States[.]" *Id.* at 705.

---

[6] The defendant in *Watts* referred to the President as "LBJ."

¶ 23          Upon his appeal, the defendant argued that his statement "was a kind of very crude offensive method of stating a political opposition to the President" and was thus shielded by the First Amendment. *Id.* at 707. In a per curiam opinion, the preeminent forum agreed with the defendant and held that the First Amendment barred his conviction. The Supreme Court of the United States began by affirming that "[t]he Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." *Id.* Notwithstanding this "overwhelming" interest, the high Court concluded that the challenged federal statute could only be applied consistently with First Amendment requirements if prosecutors could prove that the defendant made a "true threat" against the President. *Id.* at 708. In its opinion, the Supreme Court of the United States did not discuss the difference between a true threat and protected political hyperbole; instead, the high court simply concluded that "[t]aken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how [the defendant's statement] could be interpreted" as anything other than constitutionally protected political speech. *Id.*

¶ 24          The *Watts* decision contains three insights that are germane to our analysis in the instant case. First, *Watts* confirms that in defining and applying the true threats exception, a statute criminalizing speech "must be interpreted with the commands of

the First Amendment clearly in mind." *Id.* at 707. Second, *Watts* instructs us that even if a state's interest in protecting its public officials is "overwhelming," the First Amendment interest in protecting speakers who engage in controversial but constitutionally permissible speech is even more substantial. *Id.* In every case interpreting the permissible scope of a statute "which makes criminal a form of true speech . . . [w]hat is a threat must be distinguished from what is constitutionally protected speech." *Id.* Third, *Watts* provides that in order to determine whether a defendant's particular statements contain a true threat, a court must consider (1) the context in which the statement was made, (2) the nature of the language the defendant deployed, and (3) the reaction of the listeners upon hearing the statement, although no single factor is dispositive. *Id.* at 708.

### 2. *True threats and subjective intent*

The Supreme Court of the United States next directly considered the true threats exception to the First Amendment in *Virginia v. Black*, 538 U.S. 343 (2003). In *Black*, the Supreme Court examined a Virginia statute criminalizing the act of burning a cross with "an intent to intimidate a person or group of persons." *Id.* at 347. The case was before the high tribunal by virtue of consolidated appeals from three defendants who were convicted under the enacted law for burning crosses: one who burned a cross during a Ku Klux Klan rally and two who attempted to burn a cross on the lawn of their Black neighbor. *Id.* at 348–50. The defendants challenged their

convictions under the Virginia statute on two grounds. First, they argued that the statute was facially unconstitutional because it selectively discriminated against one specific type of speech—cross burning—on the basis of its "distinctive message," in violation of the First Amendment as interpreted in *R.A.V.*[7] *Id.* at 351. Second, the defendants argued that a provision of the statute which made the act of cross burning prima facie evidence of a defendant's intent to intimidate rendered the statute unconstitutional. *Id.*

In a fractured set of opinions, a plurality of the Supreme Court of the United States rejected the defendants' facial challenge but held that the prima facie evidence provision was unconstitutionally overbroad. After surveying the pervasive use of cross burnings as a tool for enforcing racial oppression across the South, the plurality examined the First Amendment implications of Virginia's statute. *Id.* at 357. The high court began with the fundamental principle that the First Amendment "ordinarily denies a State the power to prohibit dissemination of social, economic and

---

[7] In *R.A.V.*, the Supreme Court of the United States held that the First Amendment's general prohibition on content-based speech restrictions precludes a government from regulating speech "based on hostility—or favoritism—towards the underlying message expressed," even when all of the regulated speech is contained within a broader category of proscribable speech. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 (1992). Thus, while a government could prohibit certain forms of speech *because of their constitutionally proscribable content* (obscenity, defamation, etc.)," a government could not prohibit only certain speech falling within one of the proscribable categories on the basis of something other than the feature which makes the expression proscribable in the first place. *Id.* at 383–84 ("[T]he government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.").

political doctrine which a vast majority of its citizens believes to be false and fraught

with evil consequence." *Id.* at 358 (extraneity omitted) (quoting *Whitney v. California*,

274 U.S. 357, 374 (1927) (Brandeis, J., concurring)). The Supreme Court then

acknowledged the existence of well-established categorical exceptions to this general

rule, explaining that the First Amendment did not prevent the government from

"regulat[ing] certain categories of expression" which are utterly lacking in

constitutional value, including true threats. *Id.*

> "True threats" encompass those statements where the
> speaker means to communicate a serious expression of an
> intent to commit an act of unlawful violence to a particular
> individual or group of individuals. The speaker need not
> actually intend to carry out the threat. Rather, a
> prohibition on true threats protect[s] individuals from the
> fear of violence and from the disruption that fear
> engenders, in addition to protecting people from the
> possibility that the threatened violence will
> occur. Intimidation in the constitutionally proscribable
> sense of the word is a type of true threat, where a speaker
> directs a threat to a person or group of persons with the
> intent of placing the victim in fear of bodily harm or death.

*Id.* at 359–60 (extraneity omitted).

¶ 27    The plurality held that the First Amendment's general prohibition on content-

based discrimination did not prevent Virginia from singling out for regulation one

"particularly virulent form of intimidation," because "[u]nlike the statute at issue in

*R.A.V.*, the Virginia statute does not single out for opprobrium only that speech

directed toward . . . specified disfavored topics." *Id.* at 362–63. This determination

was based upon the plurality's rationale that it was acceptable for the government to target one subset of a broader category of proscribable speech—cross burning—if the focus was motivated by characteristics which made the broader category of speech—true threats—proscribable in the first place. *Id.* at 362 ("[T]he First Amendment permits content discrimination based on the very reasons why the particular class of speech at issue is proscribable.") (extraneity omitted). However, the plurality concluded that the "prima facie evidence provision . . . renders the statute unconstitutional" because it "permits the Commonwealth to arrest, prosecute, and convict a person based solely on the fact of cross burning itself." *Id.* at 364–65.

While the scope, meaning, and influence of the *Black* plurality opinion is debatable, it appears clear that *Black* authorizes the government to regulate a narrower subset of one category of constitutionally proscribable speech without prohibiting all speech which falls within that category, provided that the reason for targeting the subset of proscribable speech is the feature which pushes the broader category outside of the ambit of the First Amendment. Similarly, it also appears clear that the State need not prove that a defendant intended to actually carry out an act of violence in order to obtain a conviction of the defendant for communicating a threat. However, it remains unclear, and hence, a matter of dispute in cases such as the present one, as to whether *Black* establishes that proof of a defendant's subjective intent to threaten violence is a prerequisite to obtaining a constitutionally valid

conviction under any criminal statute and in every possible circumstance.

¶ 29        Defendant here argues that *Black* establishes such a constitutional rule that the government must prove a defendant's subjective intent as an element of the charged crime, while the State contends, on the other hand, that the plurality's reasoning was restricted to Virginia's unique cross-burning statute. Both parties find support for their respective positions in cases from other jurisdictions interpreting *Black*. *Compare Bagdasarian*, 652 F.3d at 1116 ("The Court held in [*Black*] that under the First Amendment . . . [i]t is [ ] not sufficient that objective observers would reasonably perceive [a defendant's] speech as a threat of injury or death") *with United States v. White*, 810 F.3d 212, 219 (4th Cir. 2016) (reading *Black* as not disturbing its longstanding conclusion that "the Constitution [does not] require[ ] the Government to prove that a defendant subjectively intended the recipient of the communication to understand it as threatening" to prove a true threat). The Justices of the Supreme Court of the United States themselves appear to disagree about the interpretation of the plurality opinion in *Black*. *Compare Perez v. Fla.*, 137 S. Ct. 853, 855 (2017) (Sotomayor, J., concurring in the denial of certiorari) ("[*Watts* and *Black*] strongly suggest that it is not enough that a reasonable person might have understood the words as a threat—a jury must find that the speaker actually intended to convey a threat.") *with Elonis v. United States*, 575 U.S. 723, 765 (2015) (Thomas, J., dissenting) ("The Court's fractured opinion in *Black* . . . says little about whether an

intent-to-threaten requirement is constitutionally mandated" in all cases). Both interpretations of *Black* are plausible.

¶ 30        The parties first dispute the meaning of the plurality's statement that " '[t]rue threats *encompass* those statements where the speaker *means to communicate a serious expression of an intent* to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359 (emphasis added). Defendant construes this sentence to mean that an individual communicates a true threat only when he or she speaks with the specific intent of threatening the listener. The State interprets this sentence to mean that an individual communicates a true threat whenever the individual intentionally communicates any statement which objectively contains a "serious expression of an intent" to threaten, regardless of whether the individual specifically intended to threaten the listener.

¶ 31        Defendant's narrower interpretation strikes some balance between the First Amendment's express safeguard of free speech and the government's necessary protection of society's members from acts of violence. In our view, the most "natural reading" of the language in dispute "is that the speaker intends to convey everything following the phrase *means to communicate*, rather than just to convey words that someone else would interpret as a 'serious expression of an intent to commit an act of unlawful violence.' " *United States v. Heineman*, 767 F.3d 970, 980 (10th Cir. 2014) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 631 (9th Cir. 2005)

("A natural reading of this language embraces not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to *threaten* the victim.")

By contrast, the State's argument that the plurality meant only that a speaker "must intend to make the forbidden *communication*" is broader and more direct. The State's approach hinges solely upon the speaker's volition, or lack thereof, in conveying the message, thus negating the need for a further probe into the speaker's intent to execute the described act which may or may not result in an improper imposition upon the speaker's First Amendment right to free speech. "If there is no requirement that the defendant intend the victim to feel threatened, it would be bizarre to argue that the defendant must still intend to carry out the threat." *Heineman*, 767 F.3d 970, 980–81 (10th Cir. 2014). "The clear import of this definition is that only *intentional* threats are criminally punishable consistently with the First Amendment." *Cassel*, 408 F.3d at 631.

The parties next dispute the significance of the Supreme Court's statement that "[i]ntimidation in the constitutionally proscribable sense of the word *is a type of true threat*, where a speaker directs a threat to a person or group of persons *with the intent of placing the victim in fear of bodily harm or death.*" *Id.* at 359 (emphasis added). Defendant asserts that this legal observation identifies the characteristic which transforms protected speech into a proscribable true threat: the speaker's

subjective intent to threaten. The State counters that this explanatory reference does nothing more than define a category of true threats—namely, intimidation—which is manifested when the speaker intends to threaten the listener. Under this interpretation, the First Amendment does not necessarily require proof of the speaker's subjective intent in every case involving threats. We regard *Black* to hold that a speaker's subjective intent to threaten is the pivotal feature separating constitutionally protected speech from constitutionally proscribable true threats.

### 3. *Applying subjective intent to the true threats exception*

Under the First Amendment, the State may not punish an individual for speaking based upon the contents of the message communicated. This Court recognizes that there are limited exceptions to this principle, as the State is permitted to criminalize certain categories of expression which, by their very nature, lack constitutional value. However, these categories must have narrow parameters to ensure that the State does not target or dissuade constitutionally protected expression based upon the controversial nature of the speech. Statutes which criminalize pure speech but do not require any proof of the defendant's intent may chill the utterance of protected speech by punishing morally innocent speakers and inducing self-censorship. Based upon these conclusions, we define a true threat as an objectively threatening statement communicated by a party which possesses the subjective intent to threaten a listener or identifiable group.

When an individual communicates a true threat, the First Amendment allows the State to punish the individual because a true threat is not "the type of speech [which is] indispensable to decision making in a democracy." *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 777 (1978). A true threat stems from the opposite form of speech, in that it reflects an individual's effort to settle political disputes by violence rather than deliberation. *Shackelford v. Shirley*, 948 F.2d 935, 938 (5th Cir. 1991) ("[E]xpression has special value only in the context of 'dialogue': . . . It is not plausible to uphold the right to use words as projectiles where no exchange of views is involved.") (quoting L. Tribe, American Constitutional Law, § 12–8 at 836–37 (2d ed. 1988)). An individual who communicates a true threat hopes to influence public decision-making not through legitimate means—the painstaking work of convincing fellow citizens or political leaders to change their actions or views—but by "creat[ing] a pervasive fear in victims that they are a target of violence." *Black*, 538 U.S. at 360; *see also Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1086 (9th Cir. 2002) (explaining that when a defendant makes a true threat, it is "not staking out a position of debate but of threatened demise").

The true threats exception emanates from the recognition that certain speech acts "do[ ] not in any sense contribute to the values the first amendment was designed to advance," *Shackelford*, 948 F.2d at 938, because these speech acts form "no

essential part of any exposition of ideas." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). But it is inconsistent with the First Amendment to define the true threats category so broadly as to discourage constitutionally valued speech. There is existent peril when courts are challenged to distinguish between protected speech and proscribable speech, for our legal forums cannot permit the government to impinge upon the "free trade in ideas[,] even"—especially—"ideas that the overwhelming majority of people might find distasteful or discomforting." *Black*, 538 U.S. at 358. We thus interpret all exceptions to the First Amendment as necessary but narrow departures from the "bedrock principle" that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

¶ 37 The First Amendment interest in fostering speech is particularly substantial when, as in the present case, the speech in question is a message critiquing the manner in which an elected official has chosen to carry out the position's public duties. *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.") (extraneity omitted). The First Amendment's protection of the right to criticize public officials safeguards our democracy by keeping elected representatives accountable to the people whom they serve. To ensure that this right can be vigorously and unreservedly exercised, the First Amendment constrains us to

reject any interpretation of N.C.G.S. § 14-16.7(a) which would "chill[ ] constitutionally protected political speech because of the possibility that the [State] will prosecute—and potentially convict—somebody engaging only in lawful political speech at the core of what the First Amendment is designed to protect." *Black*, 538 U.S. at 365.

¶ 38        The State contends that the subjective intent requirement is "inconsistent with the purposes of the true-threats exception to the First Amendment." We fully agree that the true threats doctrine, like all categorical exceptions to the First Amendment, permits the State to criminalize speech which is "of such slight social value . . . that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *R.A.V.*, 505 U.S. at 383.

¶ 39        The State also submits that requiring prosecutors to establish a defendant's subjective intent will "hinder the State's ability to protect its citizens from unlawful threats of violence." While we do not diminish the magnitude and legitimacy of the State's concern, nonetheless its desire to totally eliminate the element of a defendant's subjective intent must yield to the constitutional freedoms shielded by the First Amendment and recognized by the Supreme Court of the United States. In tandem with the preeminent tribunal's precedent, our interpretation of the First Amendment prompts us to decline the State's invitation to forsake a subjective intent requirement. As in *Watts*, our recognition of the State's "overwhelming[ ] interest in

protecting the safety of its [public officers] and in allowing [them] to perform [their] duties without interference from threats of physical violence," *Watts*, 394 U.S at 707, is no substitute for the First Amendment's demand that we restrain the State from criminalizing protected expression.

¶ 40        Finally, the State argues that applying *Watts* and *Black* in a manner which requires the government to prove a defendant's subjective intent "would throw the true-threats exception out of step with the rest of the First Amendment," because other constitutionally proscribable categories of speech do not require proof of a defendant's subjective intent or state of mind. This legal deduction is not a definitive declaration of the status of the law in this area.[8]

¶ 41        Even if the State is correct in its assertion that there remain areas of First Amendment law where a speaker's intent or state of mind is not central to the constitutional inquiry, our decision to require proof of subjective intent in the true threats context does not rise to a level of appellate law upheaval nor create any academic discord that does not already exist.

¶ 42        Based on the foregoing analysis, and consistent with our interpretation of the

---

[8] Although there is not a consensus, many scholars agree that the First Amendment generally requires at least some consideration of a defendant's intent or state of mind when examining the permissible scope of civil or criminal liability for speech acts. *See, e.g.*, Leslie Kendrick, *Speech, Intent, and the Chilling Effect*, 54 Wm. & Mary L. Rev. 1633, 1641 (2013) ("The Supreme Court has recognized several categories of speech that the First Amendment does not protect, such as defamation, incitement, threats, obscenity, child pornography, fraud, and fighting words. . . . Virtually all of these categories are defined by reference to the speaker's state of mind.").

First Amendment and cited relevant precedents, we determine that the State is required to prove both an objective and a subjective element in order to convict defendant under N.C.G.S. § 14-16.7(a).

**B. Sufficiency of the evidence**

¶ 43     In determining whether the Court of Appeals erred in concluding that the State presented insufficient evidence to meet its burden on both the objective and subjective prongs, this Court must employ the elements previously discussed in order to determine if defendant communicated a true threat against District Attorney Welch.

### 1.     *Independent review*

¶ 44     "[I]n cases raising First Amendment issues . . . an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (extraneity omitted). This obligation supplements rather than supplants the analysis that we typically utilize when reviewing a trial court's decision. In the context of a libel suit, this Court has explained that independent whole record review is not "inherently inconsistent with the principle that a court, on a motion for directed verdict or [judgment notwithstanding the verdict], must determine whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." *Desmond v. News and Observer Publ'g Co.*,

375 N.C. 21, 44, n.16 (2020) (extraneity omitted). The same principle is applicable in matters in which we examine a trial court's decision to deny a defendant's motion to dismiss in a criminal case.

¶ 45      Independent whole record review does not empower an appellate court to ignore a trial court's factual determinations. In this regard, an appellate court is not entitled to "make its own findings of fact and credibility determinations, or overrule those of the trier of fact." *Desmond*, 375 N.C. at 44, n.16. To the extent that the Court of Appeals failed to "defer[ ] to the jury's findings on . . . historical facts [and] credibility determinations," *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002), the State is correct regarding the basic introductory determinations that the Court of Appeals erred in its application of independent whole record review.

¶ 46      This error can be illustrated by considering the words at issue in this case. Some of the most strident language employed by defendant in his criticism of the elected district attorney, which defendant readily admitted that defendant posted on his social media page, included these statements:

- I hope those that are friends with her [the elected district attorney] share my post because she will be the first to go, period and point made.
- When the deputy ask me is it worth it. I would say with a Shotgun Pointed at him and a ar15 in the other arm was it worth to him? Who cares what happens to the person I meet at the door. I'm sure he won't. I would open every gun I have. . . . Death to our so called judicial system . . . .
- This is how politics works. That's why my harsh

words to her and any other that will Listen and share it To her [social media] page.

- If that [vigilante justice] what it takes [ ].[9] I will give them both [the elected district attorney and "any other that will Listen"][10] the [mountain] justice they deserve. . . . If our head prosecutor won't do anything then the death to her as well. Yea I said it. Now raid my house for communicating threats and see what they meet. . . .
- It can start at my house. Hell this has to start somewhere. If the courts won't do it as have been proven. Then yes it Is up to the people to administer justice! I'm always game to do so. They make new ammo everyday!
- It is time for old Time mtn justice! Yes [ ] I said it. Now let Them knock on my door.

¶ 47      While all of defendant's words *may* be political hyperbole, and hence, protected speech, defendant's social media utterances do not represent mere political hyperbole as a matter of law. Defendant's statements should not be read in isolation and are more properly considered in context; therefore, when viewed in the light most favorable to the State, these statements would potentially be reasonably regarded by a jury as constituting a true threat to inflict serious bodily injury upon or to kill the elected district attorney. Defendant's multiple uses of the word "death" in direct

---

[9] The word "that" was utilized by defendant in lieu of the phrase "vigilante justice" in response to an observer's social media post who used the phrase "vigilante justice" in supporting defendant's views.

[10] The reference to "both" made by defendant was included in the next social media post which followed a social media post by him regarding two different persons: ". . . her and any other that will Listen . . . ."

reference to the elected district attorney and the judicial system in which she was serving, defendant's favorable reception to the exercise of "vigilante justice" and "old time mountain justice" for those individuals who are a part of the court system, defendant's numerous representations of his willingness to utilize firearms to accomplish his manifesto, defendant's several expressions of bravado concerning his commitment to employ firearms against any representative of the criminal justice system, and defendant's repeated expression of the hope that the elected district attorney would become aware of defendant's social media posts all combine to warrant consideration by a jury as to whether defendant has issued a true threat to inflict serious bodily injury upon or to kill the elected district attorney.

¶ 48 Because the question of whether the State presented substantial evidence of each essential element of the offense charged so as to survive defendant's motion to dismiss is a question of law, we review a trial court's denial of a defendant's motion to dismiss de novo. *State v. Blagg*, 377 N.C. 482, 2021-NCSC-66, ¶ 10. In contrast, in ruling on a defendant's motion to dismiss, the trial court itself

> need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator. Substantial evidence is the amount necessary to persuade a rational juror to accept a conclusion. In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. In other words, if the record developed at trial contains substantial

evidence, whether direct or circumstantial, or a combination, to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.

*State v. Golder*, 374 N.C. 238, 249–50 (2020) (extraneity omitted).

¶ 49        Justice Earls, our learned colleague who concurs in part and dissents in part with our opinion, views our determination of the correctness of the trial court's decision to deny defendant's motion to dismiss based upon the State's presentation of substantial evidence of the charged offense as an exercise of speculation on our part which reaches a conclusion which she opines that the evidence does not support. However, not only have we refrained from drawing such factual conclusions from the evidence, but we have observed the well-established principle that "[t]he *jury's* role is to weigh evidence, assess witness credibility, assign probative value to the evidence and testimony, and determine what the evidence proves or fails to prove." *State v. Moore*, 366 N.C. 100, 108 (2012) (emphasis added). Therefore, a jury is required to have the opportunity to fulfill these responsibilities in the present case upon remand.

¶ 50        The bar to survive a defendant's motion to dismiss for insufficiency of the evidence is low, such that "[i]t is sometimes difficult to distinguish between evidence sufficient to carry a case to the jury, and a mere scintilla, which only raises a suspicion or possibility of the fact in issue." *State v. Earnhardt*, 307 N.C. 62, 66 (1982) (quoting *State v. Johnson*, 199 N.C. 429, 431 (1930)). However, "if there be *any* evidence

tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury." *Id.* (emphasis added) (quoting *Johnson*, 199 N.C. at 431); *see also State v. Butler*, 356 N.C. 141, 145 (2002) ("To be substantial, the evidence need not be irrefutable or uncontroverted; it need only be such as would satisfy a reasonable mind as being 'adequate to support a conclusion.' " (quoting *State v. Lucas*, 353 N.C. 568, 581 (2001))). When considering a motion to dismiss for insufficiency of the evidence a trial court "should not be concerned with the weight of the evidence." *Earnhardt*, 307 N.C. at 67.

¶ 51    This oft-cited precedent reveals the great deference which our courts, whether at the trial or appellate level, must give to the vital role of the citizens of our state's local communities who are selected to serve as jurors.[11] "Once the [trial] court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then *it is for the jury to decide* whether the facts, taken singly or in combination, satisfy it beyond a reasonable doubt that the defendant is actually guilty." *State v. Fritsch*, 351 N.C. 373, 379 (2000) (emphasis added) (extraneity omitted). For this reason, "[i]n borderline or close cases, our courts have consistently

---

[11] A role of the jury is "to act as the voice and conscience of the community . . . [and] to temper the harshness of the law with the 'commonsense judgment of the community.' " *State v. Scott*, 314 N.C. 309, 311–12 (1985) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975)).

expressed a preference for submitting issues to the jury." *State v. Yisrael*, 255 N.C. App. 184 (2017), *aff'd per curiam*, 371 N.C. 108 (2018); *see also State v. Blagg*, 377 N.C. 482, 2021-NCSC-66, ¶ 12.

¶ 52 In applying the cited case law to the present case, it is clear that the duty of the trial court was to determine whether there was substantial evidence of the criminal offense of a threat against a court officer and substantial evidence that defendant was the perpetrator of the offense, as the trial court considered the evidence in the light most favorable to the State in order to ascertain if defendant's motion to dismiss should be allowed or denied. Since there was no dispute that defendant created the social media posts at issue, and since these messages of defendant constitute substantial evidence of a threat against the elected district attorney when this evidence is viewed in the context of the State's entitlement to every reasonable intendment and inference to be taken from it, we therefore determine that our legal precedent has firmly established that defendant's motion to dismiss was correctly denied and that the case should have been considered by the jury. Once this modest standard of evidence was satisfied by the State, then a jury composed of defendant's neighboring citizens should have had the opportunity to determine if defendant had made a true threat to the local district attorney.

¶ 53 In acknowledging the State's concession that defendant's conviction must be vacated because of the trial court's error in failing to properly instruct the jury

concerning the operation of the First Amendment, the sole issue for this Court to determine is whether to remand the matter to the trial court for, after vacating the trial court's judgment rendered pursuant to the conviction, entry of a judgment of acquittal or a new trial. Because, as we have discussed above, the facts presented by the State could have allowed a reasonable jury to conclude defendant uttered a true threat, a properly instructed jury must be allowed to consider this question.

¶ 54        Accordingly, while we agree with the Court of Appeals' decision to vacate defendant's conviction, there remain factual questions for a properly instructed jury to determine. Therefore, we reverse the Court of Appeals opinion that remands this case to the trial court for entry of a judgment of acquittal, and instead we remand the case to the trial court for a new trial in order to permit a jury composed of defendant's peers to determine whether defendant committed the criminal offense of making a threat to inflict serious bodily injury upon or to kill a court officer because of the exercise of that officer's duties, in violation of N.C.G.S. § 14-16.7.

        REVERSED AND REMANDED.

Justice EARLS concurring in part, dissenting in part.

I concur in the portion of the majority opinion holding that, to convict a defendant under N.C.G.S. § 14-16.7(a), the First Amendment requires the State to prove both that the defendant has communicated a message that a reasonable observer would understand to contain a threat of violence and that the defendant communicated the message with the subjective intent to threaten an individual or identifiable group. I write separately on this issue to offer two additional observations. First, the common law principles articulated in *Elonis v. United States*, 575 U.S. 723 (2015) bolster the majority's conclusion that a true threat requires proof of the speaker's subjective intent to threaten. Second, it is important to recognize the tension inherent in the true threats doctrine in light of the First Amendment's broader purpose of fostering the conditions for democratic self-governance.

However, I respectfully dissent from the majority's conclusion that the State's evidence in this case was sufficient to withstand Taylor's motion to dismiss. An objectively reasonable observer viewing Taylor's Facebook posts in their full context could not understand his messages to contain a serious intention to inflict bodily harm on District Attorney Welch. Further, even if the State had satisfied the objective element, there is insufficient evidence to support the conclusion that Taylor subjectively intended to threaten District Attorney Welch with violence. The majority's decision to hold otherwise reflects a misapplication of the independent

review standard which is inconsistent with the assiduous protection of free expression the First Amendment demands.

## I. Common law principles support the conclusion that attaching criminal liability to purportedly threatening speech requires consideration of the speaker's subjective intent.

In *Elonis v. United States*, 575 U.S. 723 (2015), the United States Supreme Court considered a defendant's challenge to his conviction under a federal statute criminalizing the act of communicating threats across state lines. In his argument to this Court, Taylor invoked *Elonis* for the proposition that to comport with the First Amendment, criminal statutes targeting pure speech must be construed to incorporate a heightened mens rea requirement. The State argued that because *Elonis* was decided solely on statutory interpretation grounds, the decision was entirely irrelevant. However, the common law principles *Elonis* was based on are especially salient in the First Amendment context and support the conclusion that statutes proscribing pure speech must be interpreted to incorporate a heightened mens rea requirement.

The defendant in *Elonis* posted "self-styled 'rap' lyrics," poems, and photographs with "graphically violent language and imagery" on Facebook. *Id.* at 726–27. Some of the language and imagery was directed at the defendant's employer. *Id.* Other posts contained "crude, degrading, and violent material about [the defendant's] soon-to-be ex-wife," including a post asking if the protective order his

wife had obtained was "thick enough to stop a bullet." *Id.* at 727–30. In the same post, the defendant claimed he possessed "enough explosives to take care of the State Police and the Sheriff's Department." *Id.* Another post read, "[e]nough elementary schools in a ten mile radius to initiate the most heinous school shooting ever imagined And hell hath no fury like a crazy man in a Kindergarten class The only question is . . . which one?" *Id.* at 729. The defendant invoked his "freedom of speech" under the First Amendment and asserted his messages were protected as artistic expression. *Id.*

¶ 59    Despite his disclaimers, the defendant in *Elonis* was indicted for "making threats to injure patrons and employees of the park, his estranged wife, police officers, a kindergarten class, and an FBI agent, all in violation of 18 U.S.C. § 875(c)." *Id.* at 731. As written, this federal statute applied to anyone who "transmit[ted] in interstate or foreign commerce any communication containing . . . any threat to injure the person of another." *Id.* at 732. At trial, the defendant requested a jury instruction stating that in order to convict him under 18 U.S.C. § 875(c), "the government must prove that he intended to communicate a true threat." Id. at 731. The government countered that "it was irrelevant whether [the defendant] intended the postings to be threats." *Id.* at 732. The trial court agreed with the government, the instruction was not given, and the defendant was convicted. *Id.* The Third Circuit affirmed, concluding that "the intent required by [18 U.S.C. § 875(c)] is only the intent to communicate words that the defendant understands, and that a reasonable person

would view as a threat." *Id.* at 732.

¶ 60 In an opinion authored by Chief Justice Roberts, the United States Supreme Court reversed. According to the majority, although 18 U.S.C. § 875(c) "does not indicate whether the defendant must intend that his communication contain a threat," Congress's failure to "specify any required mental state . . . does not mean that none exists." *Id.* at 734. Instead, the majority invoked the longstanding "rule of construction" that criminal statutes should be interpreted to "include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Id.* (citing *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 70 (1994)). In the majority's view, under 18 U.S.C. § 875(c), "the crucial element separating legal innocence from wrongful conduct is the threatening nature of the communication." *Id.* at 737 (cleaned up). Applying its own rule of statutory construction, the majority read 18 U.S.C. § 875(c) as incorporating a requirement that the defendant be at least reckless with regards to the possibility that the "contents of" the communicated message contained a threat.[1] *Id.* at 740.

¶ 61 In justifying the statutory presumption it was invoking, the *Elonis* majority explained "that a defendant generally must know the facts that make his conduct fit

---

[1] The majority vacated the defendant's conviction and remanded the case without deciding whether that scienter requirement could be satisfied by a showing of recklessness alone, or if the government was required to prove a defendant possessed actual knowledge that the message he or she communicated contained a threat. *Elonis*, 575 U.S. at 742.

the definition of the offense, even if he does not know that those facts give rise to a crime." *Id.* at 735 (cleaned up). That is, a defendant must know he is engaging in the type of conduct that is criminalized (in the defendant's case, communicating a threat), even if he or she does not know that the conduct gives rise to criminal liability. *See X-Citement Video, Inc.*, 513 U.S. at 72, n.3 ("Criminal intent serves to separate those who understand the wrongful nature of their act from those who do not, but [intent] does not require knowledge of the precise consequences that may flow from that act once aware that the act is wrongful."). This logic reflects a "basic principle underlying the common law, namely, the importance of showing what Blackstone called 'a vicious will.'" *Rehaif v. United States*, 139 S.Ct. 2191, 2196 (2019) (quoting 4 W. Blackstone, Commentaries on the Laws of England 21 (1769)). Accordingly, most criminal offenses incorporate a scienter requirement to distinguish between the "morally culpable" defendant who chooses to engage in wrongful conduct and the defendant whose "otherwise innocent conduct" happens to be criminal. *Elonis*, 575 U.S. at 745 (Alito, J., concurring in part, dissenting in part); *see also Rehaif*, 139 S. Ct. at 2196 ("The cases in which we have emphasized scienter's importance in separating wrongful from innocent acts are legion.").

¶ 62    The need to distinguish between culpable and innocent conduct is heightened when a statute criminalizes pure speech. Pure speech cannot ordinarily be made criminal based solely upon the message the speaker conveys. That is a core First

Amendment premise. To the extent there are recognized exceptions to this baseline rule, it is never the act of speaking alone that statutes like N.C.G.S. § 14-16.7(a) criminalize. It is the act of speaking a particular kind of message which, by its very nature, removes the speech from the First Amendment's ambit. The State is allowed to convert an act which is ordinarily non-criminal—an act which individuals ordinarily possess a hallowed constitutional right to engage in—into criminal conduct solely because of the substance of the message communicated. An intent requirement helps ensure that only those individuals who are morally culpable are criminally punished.

At the same time, when a criminal statute implicates the First Amendment, the presumption in favor of a heightened mens rea requirement also helps ensure that the First Amendment protections enjoyed by all individuals remain vibrant. In his partial concurrence, Justice Alito acknowledged this interaction between criminal scienter requirements and First Amendment protections, noting the argument that defining a threats statute in a manner "not limited to threats made with the intent to harm[ ] will chill statements that do not qualify as true threats, e.g., statements that may be literally threatening but are plainly not meant to be taken seriously." *Elonis*, 575 U.S. at 748 (Alito, J., concurring in part, dissenting in part). In Justice Alito's view, "[r]equiring proof of recklessness" would strike a sufficient balance between providing "adequate breathing space" for the exercise of First Amendment

rights and preventing the conversion of "hurtful, valueless threats into protected speech." *Id.* The concerns Justice Alito identified have both common law and First Amendment dimensions. There is a risk that individuals will lack notice that certain speech acts could subject them to criminal punishment, and a risk that individuals will engage in self-censorship to avoid treading past the inchoate boundaries of an expansive criminal statute targeting speech. An intent requirement helps ensure that all individuals can detect the boundary between protected and proscribable speech.

¶ 64 The principles at issue in *Elonis*, though couched in the common law, have purchase in the First Amendment context. In my view, these principles strongly imply that it would be impermissible to punish Taylor if he did not act with at least reckless disregard towards the possibility that he was communicating a threat of violence to District Attorney Welch. Without some scienter requirement, Taylor could be convicted even if he were unaware he had engaged in the type of conduct N.C.G.S. § 14-16.7(a) criminalizes. Such a conviction would offend both common law and First Amendment principles. Accordingly, I believe *Elonis* lends further support and important context to the majority's conclusion that true threats require proof of the speaker's subjective intent.

## II. A true threat is speech without constitutional value, but the proliferation of true threats has constitutional salience.

¶ 65 The relevant precedents and First Amendment principles require the State to prove Taylor's subjective intent to threaten. Nevertheless, the scope of the true

threats doctrine must not be too narrow because true threats can practically undermine the values of freedom of speech and civic engagement that the First Amendment serves.

¶ 66          One of the principal justifications for permitting the State to punish true threats is its interest in "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). As *R.A.V.* indicates, true threats may be regulated at least in part because of the reaction they engender in the individual recipients of these threats and in the broader community. The State's interest in preventing that fear is not just a practical matter of public safety. The reaction of recipients and the broader community to true threats is of significant concern because the proliferation of true threats undermines that which the First Amendment aspires to "grow[ ] and preserv[e]," our system of "democratic self-governance." *McDonald v. Smith*, 472 U.S. 479, 489 (1985) (Brennan J., concurring).

¶ 67          If the cost of participating in public life is to be bombarded with serious threats of violence towards one's self and family, many people will choose to forego contributing their voices to the "free exchange [that] facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2046 (2021); *see also Planned Parenthood of Columbia/Willamette, Inc.*, 290 F.3d at

1086 (concluding that it "turns the First Amendment on its head" to protect threats of violence because after being subjected to such a threat, victims "can no longer participate in the debate" about a controversial issue). This degrades the "marketplace of ideas" upon which "[o]ur representative democracy" depends. *Id.* As a result, the public will be left without the benefit of "information [which] is a precondition for public debate, which, in turn, is a precondition for democratic self-governance." *Hum. Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1022 (9th Cir. 2010).

¶ 68    But true threats do more than dissuade others from contributing to the "marketplace of ideas." True threats interfere with the exercise of *all* the "cognate rights" and "indispensable democratic freedoms secured by the First Amendment." *Thomas v. Collins*, 323 U.S. 516, 530 (1945). When true threats proliferate, the attendant fear of imminent violence deters individuals from participating in the institutions, processes, and everyday interactions through which Americans endeavor to shape the course of collective life. Faced with the threat of retributory violence, individuals may choose to forego exercising their rights to associate with like-minded citizens, to publicly assemble in protest or support of existing policies, to petition their government and public officials, or to publish their views for widespread distribution. Because it is the exercise of these rights which "protect and nurture the sort of active citizenship and collective action that have been the lifeblood of our

system of government since its founding," Ashutosh Bhagwat, *The Democratic First Amendment*, 1098 Nw. U. L. Rev. 1097, 1123 (2016), the proliferation of true threats is a danger to the vitality of our democracy.

¶ 69        True threats represent a particular First Amendment problem because of the ways the specter of violence warps the processes from which our government derives its legitimacy. Our nation's and our state's own history reveal how threats of violence and actual violence have kept people from exercising democratic rights they formally enjoyed. *See, e.g.*, David Zucchino, *Wilmington's Lie: The Murderous Coup of 1898 and the Rise of White Supremacy*, Atlantic Monthly Press (2020). If our First Amendment doctrines foster the proliferation of threats which make the reasonable fear of imminent violence a pervasive feature of political life, the First Amendment loses its point. *R.A.V.* also highlighted the concern that allowing threats of violence to go unpunished would contribute to real-world violence. A First Amendment which fosters political violence is self-defeating, because a society which settles political disputes by resorting to violence—or a society which is forced to settle political disputes in the looming shadow of violence—cannot function as a self-governing democracy.

¶ 70        These realities highlight the risk that an overly narrow definition of what constitutes a true threat will lend a cloak of legitimacy to methods of achieving political change that are antithetical to everything the First Amendment stands for.

At the same time, we must consider the First Amendment's paramount interest in fostering the free exchange of ideas, and the immense value to our system of governance that this free exchange provides. *Cf. United States v. Caldwell*, 408 U.S. 665, 720–21, (1972) ("[T]he wideopen and robust dissemination of ideas and counterthought . . . is essential to the success of intelligent self-government.") (Douglas, J., dissenting). This interest may seem remote when the speech at issue appears to most who encounter it to be crude, caustic, or fantastical, but our system functions best when citizens are "active, collective, disrespectful, and even sometimes incendiary." Bhagwat at 1123; *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 228 (2010) ("[H]arsh criticism, short of unlawful action, is a price our people have traditionally been willing to pay for self-governance.") (Scalia, J., concurring).

¶ 71    Ultimately, this case is not about the State's authority to punish individuals who make true threats. That authority is uncontroverted. Instead, this case is about distinguishing protected from proscribable speech. While I recognize that the purposes the First Amendment serves require vigorous enforcement of statutes like N.C.G.S. § 14-16.7(a), the majority has appropriately defined the scope of the true threats doctrine. To prove a true threat, the State must prove both that the statement in question contained an objective threat of violence and that the defendant intended

to communicate a threatening message.[2] Thus, I concur fully in Part II of the majority opinion.

### III. The State presented insufficient evidence to support the conclusion that Mr. Taylor communicated a true threat.

¶ 72 Although the majority correctly defines what constitutes a true threat, the majority falters when tasked with applying its definition to the facts of this case. Despite reciting the proper standard of review, the majority does not actually conduct the requisite independent review of Taylor's conviction.

¶ 73 As the United States Supreme Court has explained, when a defendant's conviction potentially violates the First Amendment, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984).

---

[2] Practically speaking, it is worth noting that in many cases, it is unlikely that a defendant who has conveyed a clear and unambiguous threat will be able to successfully argue they did not intend to do so. See *Pope v. Illinois*, 481 U.S. 497, 503 (1987) ("In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause injury."). In this context, when a communication is so "unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution," then a defendant who understands the meaning of the words deployed will have a difficult time disputing the reasonable inference that he or she intended to place the listener in fear of imminent bodily harm. *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976); *see also United States v. Maxton*, 940 F.2d 103, 106 (4th Cir. 1991) ("[M]ost of the time [a defendant's] intent [to threaten] can be gleaned from the very nature of the words used in the communication; extrinsic evidence to prove an intent to threaten should only be necessary when the threatening nature of the communication is ambiguous.").

The majority is correct that independent review "supplements rather than supplants" the trial court's role as a factfinder, in that we defer to the jury's findings on historical facts and its credibility determinations. In general, when reviewing pure questions of fact, we take the evidence in the light most favorable to the party opposing the motion to dismiss on all factual issues. *State v. Mason*, 336 N.C. 595, 597, 444 S.E.2d 169, 169 (1994) ("In determining whether evidence is sufficient to survive a motion to dismiss, the evidence is considered in the light most favorable to the State. If there is a conflict in the evidence, the resolution of the conflict is for the jury."). As we indicated in *Desmond*, the same should hold true when an appellate court applies independent review. *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 45, n.17, *reh'g denied*, 376 N.C. 535 (2020). ("We emphasize that our discussion of the evidence in this case is a reflection of the record as viewed in the light most favorable to plaintiff and summarizes what the jury could permissibly have found as fact."); *Cf. Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 107 (1st Cir. 2000) (explaining that when conducting independent review in a case implicating the First Amendment, "[p]urely factual determinations, particularly those involving the credibility of witnesses, remain best addressed by the factfinder, and are subject to the usual, more deferential standard of review.").

¶ 74    But the questions of whether Taylor's statements contained an objective threat of violence and whether he possessed an intent to threaten are mixed questions of

constitutional law and fact. *Cf. Butt v. State*, 2017 UT 33, ¶ 29 ("The First Amendment defense at issue involves a mixed determination of law and fact."). On questions of constitutional law, our review is "plenary." *Veilleux*, 206 F.3d at 106. The majority collapses this distinction. The appellate court must take the evidence in the light most favorable to the State only with respect to disputed *factual* issues. For example, the parties dispute whether District Attorney Welch's actions after being notified of Taylor's posts evinced serious fear that reflected her contemporaneous belief that Taylor would try to harm her. On this issue, where there is evidence in the record supporting the State's position including District Attorney Welch's testimony, we must presume that she did in fact fear for her personal safety and consider that fact to the extent it is illustrative in the First Amendment analysis. Similarly, the parties dispute whether Taylor wanted District Attorney Welch to see his Facebook posts. Again, because there is evidence in the record supporting the State's assertion that Taylor did want District Attorney Welch to become aware of his statement, we must adopt that fact at this stage of the proceedings.

¶ 75      However, this Court has a "constitutional responsibility" to decide the ultimate question of whether the First Amendment permits Taylor to be convicted for violating N.C.G.S. § 14-16.7(a) on these facts. *Bose Corp.*, 466 U.S. at 501. ("[T]he rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the

particular case by a jury or by a trial judge."). Even if the defendant has been found guilty of violating a statute criminalizing potentially protected First Amendment activities, "our obligation is to make an independent examination of the whole record, so as to assure ourselves that th[is] judgment does not constitute a forbidden intrusion on the field of free expression." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557, 567–68 (1995) (cleaned up); *see also Veilleux*, 206 F.3d at 106 ("Deference to the jury is muted, however, when free speech is implicated . . . . Appellate courts—especially but not only the Supreme Court—have been assigned this obligation in order to safeguard precious First Amendment liberties."). Our task is not, as the majority frames it, to decide if Taylor's "statements would potentially be reasonably regarded by a jury as constituting a true threat." Our task is to decide if, taking the evidence on disputed factual issues in the light most favorable to the State, the jury could permissibly conclude that Taylor's Facebook posts contained a true threat consistent with applicable First Amendment principles. *See Desmond*, 375 N.C. at 44, n.16 (explaining that the goal of independent review in a libel case is "to ascertain whether the record can permissibly and constitutionally support a finding of actual malice"). By treating Taylor's appeal as no different than any criminal defendant's appeal from a trial court's motion to dismiss, the majority eschews an obligation we are not entitled to ignore.

If, as the majority claims, "[t]he bar to survive a defendant's motion to dismiss

for insufficiency of the evidence is low," then there is very little to prevent the State from charging any individual who makes controversial or distasteful statements under N.C.G.S. § 14-16.7(a) and bringing the case to trial.[3] True, the defendant may ultimately prevail and be found not guilty. But the prospect of facing a lengthy, expensive trial is itself a deterrent to the free exercise of First Amendment rights. *Cf. Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("[S]ummary proceedings are essential in the First Amendment area because if a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails.") (cleaned up). Taylor has been defending himself in this case for over five years and faces the prospect of still more litigation should the State choose to try him again. The practical effect of the majority's failure to properly construe and apply the independent review standard will be precisely the outcome the majority claims the First Amendment compels us to avoid, the chilling of constitutionally protected speech.

¶ 77    Properly applying independent review, the State has failed to present substantial evidence to sustain Taylor's conviction on either the objective or

---

[3] In fact, on appellate review of a trial court's denial of a defendant's motion to dismiss, "the reviewing court must determine whether there is substantial evidence of each essential element of the offense and substantial evidence that the defendant was the perpetrator of the offense." *State v. Smith*, 307 N.C. 516, 518 (1983). The majority's formulation that the "bar . . . is low" appears to conflate the probable cause necessary to sustain an indictment with the substantial evidence necessary to survive a motion to dismiss. Logically, these two standards cannot be the same—if they were, there would be no point in allowing a defendant to file a motion to dismiss for insufficient evidence.

subjective elements of the true threats doctrine.

### 1. *The objective element*

Although the majority claims it is assessing Taylor's statements in their full context, the majority instead isolates snippets of "strident language" which it concludes "do not represent mere political hyperbole as a matter of law." The problem with the majority's approach is that it fails to account for how the context surrounding Taylor's statements would have informed how a reasonable observer could have interpreted the language he chose to deploy. A reasonable observer who viewed Taylor's Facebook posts in their full context could not understand his statements to contain an objective threat of violence.

Even the statements Taylor made which most plausibly read to suggest the possibility of actual violence—that District Attorney Welch "will be the first to go" and that "[i]f [she] won't do anything, then the death to her as well"—are not direct threats of harm. Both statements are conditional. Whatever Taylor is implying he will do is predicated on the occurrence of some antecedent event (a "rebellion against our government," District Attorney Welch refusing to "do anything" to prosecute alleged criminals in Macon County), events which a reasonable person would not

believe to be imminent or inevitable, at least at the time Taylor posted his messages.[4] Given the context, no reasonably listener could infer that his hypothetical and conditional statements were literal pronouncements of his intent to physically harm District Attorney Welch.

¶ 80        Although Taylor did use language suggesting he might try to remedy perceived injustices through something other than political advocacy, none of these statements suggested he was planning to personally target District Attorney Welch with violent acts. Taylor's statements referencing violence included his promise to "open every gun I have" should law enforcement raid his home; his declaration that he is "always game" to "administer justice" because "[t]hey make new ammo everyday!"; his response "If that what it takes" when his Facebook friend called for "vigilante justice"; and his announcement that it was "time for old [t]ime m[ountain] justice," which Taylor would deliver "[r]egardless of what the law or courts say" because he was "tired of this political bullshit." None of these statements contain words threatening District Attorney Welch specifically with actual violence. Further, a message advocating for

---

[4] In assessing what meaning a reasonable person could glean from Taylor's statements, a court must assess the statements from the perspective of a reasonable person who heard the statements at the time they were made, not a reasonable person who encountered his statements today. In 2016, a reasonable person would likely have found the prospect of a violent "rebellion against our government" far more remote than a reasonable person would today, with knowledge of the events at the United States Capital on 6 January 2021. *Cf. State v. Taylor*, 270 N.C. App. 514, 570 (2020) ("Further, if D.A. Welch 'will be the first to go,' it would only occur during a 'rebellion against our government[.]' The alleged 'threat' is contingent upon an event that no reasonable person would believe was ever likely to occur.").

the use of violence to achieve political change is not the same as a message conveying a serious expression of an intent to harm a specific person. Protected political speech is not "remove[d] . . . from the protection of the First Amendment" merely because it contains "*advocacy* of the use of force or violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982). There is nothing in the posts connecting Taylor's apparent willingness to resort to violence to his comments about what would happen to District Attorney Welch in the future if certain events were to occur. Taylor's messages reveal nothing more than the depth of his feeling regarding what he saw as a grave injustice in Macon County.

¶ 81        Importantly, Taylor communicated his threats in the midst of a heated discussion centered on political matters of significant concern to Taylor and his Facebook friends. The fact that a statement was communicated in the middle of a conversation regarding political issues is relevant when assessing what inferences an observer could reasonably draw from language that is only ambiguously violent. That Taylor "spoke his threatening words in the context of his political views" while a perceived political crisis "was just unfolding" is relevant information a reasonable listener would necessarily consider in ascertaining the meaning of Taylor's remarks. *United States v. Olson*, 629 F. Supp. 889, 894 (W.D. Mich. 1986). As is the fact that Taylor removed the messages from his Facebook page shortly after posting them. The majority errs in failing to account for this context.

¶ 82      Notably absent from Taylor's diatribe is any language supporting the reasonable belief that he intended "to do anything specific to anyone at any particular time." *Taylor*, 270 N.C. App. at 569. As the Supreme Court of Colorado has explained, the true threats inquiry "should include whether the threat contains accurate details tending to heighten its credibility." *Colorado ex rel. R.D.*, 2020 CO 44, ¶ 53. Here, Taylor did not specify a "date, time, and place" or method for where and how he intended to carry out his purported threat. *Cf. United States v. Callahan*, 702 F.2d 964, 966 (11th Cir. 1983). The majority points to nothing which would lead a reasonable listener to conclude that Taylor had considered acting on these supposed threats.[5] *Cf. United States v. Ivers*, 967 F.3d 709, 717 (8th Cir. 2020) (finding sufficient evidence to support a threats conviction where defendant stated "[y]ou don't know the 50 different ways I planned to kill [the victim]").

¶ 83      Other courts have accorded significant weight to the presence or absence of such details in examining whether a defendant's statements could reasonably be construed as an objective threat. For example, the Supreme Court of Washington concluded that there "was ample evidence from which a reasonable jury could determine that [a defendant's] threats were 'true threats,' " *State v. Schaler*, 169

---

[5] To be clear, the State need not prove Taylor intended to carry out the threatened act in order to prove he communicated a true threat. I raise this point only to demonstrate why a reasonable observer could not understand these statements as containing threats of imminent violence.

Wash. 2d 274, 291 (2010), based in part on the fact that defendant "specifically said that 'he wanted to kill them with his bare hands, by strangulation,' " "repeated his desire to kill his neighbors" on multiple occasions, and had previously threatened his neighbors with a chain saw, *id.* at 280.

¶ 84        By contrast, the Supreme Judicial Court of Massachusetts held that the evidence was insufficient to convict a defendant who posted a photograph of himself holding a gun with the caption "[m]ake no mistake of my will to succeed in bringing you two idiots to justice," because "nothing else about that image suggests a clear intent to commit violence." *Massachusetts v. Walters*, 472 Mass. 680, 695 (2015). Here, although Taylor's posts may have "come across as vaguely ominous or disturbing," *id.*, they do not give rise to the reasonable inference that Taylor intended to physically harm District Attorney Welch. Additionally, Taylor and District Attorney Welch previously maintained a cordial relationship, and there was no evidence indicating Taylor had a propensity for engaging in violent conduct. *Cf. In re S.W.*, 45 A.3d 151, 160 (D.C. 2012) (concluding that even "facially threatening words" could not be "reasonably and objectively perceived as communicating a threat" when "placed in the context of [the defendant and the purported victim's] acknowledged and unaltered friendship . . . and [the defendant's] manner of delivery"). Again, all this context which the majority ignores is relevant in assessing the meaning a reasonable person could draw from Taylor's posts.

The reaction of the individuals who interacted with Taylor's posts while his diatribe was unfolding is particularly telling. For example in *Watts*, the Supreme Court thought it notable that "[the defendant] and the crowd laughed after the [purported threat] was made." *Watts*, 394 U.S. 705, 707 (1969). This emphasis on the reactions of those actively participating in the broader exchange within which the purported threats were communicated reflects the commonsense intuition that the actual and intended recipients of a message are in the best position to discern its meaning. *See, e.g., D.M. ex rel. D.J.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 764 (8th Cir. 2011) ("The reaction of those who read [the speaker's] messages is evidence that his statements were understood as true threats. [The recipient] contacted . . . a trusted adult, to discuss what in her words was 'something serious.' "). As the Court of Appeals explained,

> Defendant was engaging in a heated discussion, or "debate," about a political concern with his Facebook friends, which was emotionally charged due to the content of the discussion, a dead child, as well as shared feelings, very likely incorrect, that D.A. Welch improperly declined to prosecute the parents. Facebook has the status of a "public square," but can feel like a "safer" place to discuss controversial topics or make inappropriate, hyperbolic, or boastful statements. The audience is generally known to the person posting, and there is often a sense of community and like-mindedness. The record evidence is that every response to Defendant's posts on Facebook was supportive of Defendant's comments. None of the responses on Facebook indicated concern that Defendant might be planning to kill D.A. Welch. By posting on Facebook, Defendant was expressing his feelings publicly, but

selectively, in the "most important place[ ] ... for the exchange of views."

*State v. Taylor*, 270 N.C. App. 514, 578–79 (alterations in original) (quoting *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017)). None of the active participants in this conversation said or did anything reflecting even a modicum of concern that Taylor was imminently planning to physically harm District Attorney Welch. The only person who did find Taylor's messages concerning—the detective in the Macon County Sheriff's Office—was an "*unintended* recipient[ ]" who "stumble[d] upon" the posts, not someone whose reaction is illustrative of what a reasonable person would conclude with full knowledge of the surrounding context. *Colorado ex rel. R.D.*, 2020 CO 44 at ¶ 60.

Taking this evidence in the light most favorable to the State, a reasonable person who encountered Taylor's statements—and who was familiar with the context in which they were made—could, at most, conclude that Taylor communicated a statement containing an ambiguous, allusive threat of violence to be carried out in some unknown way, by some unknown person, at some unknown time, after the occurrence of two vaguely defined events which may or may not have ever occurred. That is not the kind of statement the First Amendment allows the State to criminally punish. In my view, even when all disputed factual issues are taken in the light most favorable to the State, a jury could not have found that Taylor communicated a message that a reasonable person would interpret as a threat to harm District

Attorney Welch consistent with First Amendment principles.

### 2. *The subjective element*

¶ 88      The majority also errs in concluding that there is substantial evidence to support the conclusion that Taylor possessed a subjective intent to threaten District Attorney Welch.

¶ 89      "Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred." *State v. Bell*, 285 N.C. 746, 750 (1974). Here, the circumstances overwhelmingly and exclusively support the conclusion that Taylor intended to communicate his outrage over what he saw as District Attorney Welch's (and the broader criminal justice system's) malfeasance, not to threaten District Attorney Welch with violence. As described above, I do not believe Taylor's indirect language is itself indicative of any intent to threaten. Neither is the context in which the purported threats were communicated. Taylor's boastful, hyperbolic string of Facebook posts, which he quickly deleted, supports the conclusion that he was blowing off steam, not that he was seeking to make District Attorney Welch fear impending bodily harm. The fact that he chose profane, offensive, and opprobrious words to communicate his message does not convert what can only be understood as a "crude offensive method of stating a political opposition to" District Attorney Welch's actions into a true threat against her life. *Watts*, 394 U.S. at 707.

¶ 90　　　　Taylor's actions after communicating the statements are also relevant in assessing his subjective intent. *Cf. State v. Biggs*, 224 N.C. 722, 726 (1944) ("[P]roof of the commission of like offenses may be competent to show intent, design, guilty knowledge, or identity of person or crime. This rule applies equally to evidence of like offenses committed subsequent to the offense charged.") (citation omitted). His actions provide no support for the inference that he intended to threaten District Attorney Welch.

¶ 91　　　　First, Taylor deleted his Facebook posts shortly after they were published. Second, Taylor was fully cooperative with law enforcement investigators and immediately disclaimed any intent to threaten District Attorney Welch when questioned by the SBI. *Cf. Ivers*, 967 F.3d at 719 ("[W]hen deputy marshals later confronted [the defendant] about the [purported threat], he initially refused to speak with them; shouted at them; referred to [the victim] by a racial epithet; . . . and confirmed that he remained 'crazy fucking angry.' "). Third, Taylor tried to apologize to District Attorney Welch as soon as he learned his messages had caused her distress. *Cf. State v. Trey M.*, 186 Wash. 2d 884, 907 (2016) ("[The defendant's] failure to acknowledge that shooting the boys would be wrong [ ] argue[s] in favor of this being a true threat. Further, [the defendant] repeated his plan to kill the boys to [the investigating officer], who also testified regarding the plan's depth of detail, [the defendant's] demeanor, and [the defendant's] absence of misgivings about what he

was planning."). While it is possible that a defendant could act with a fleeting intent to threaten violence, there is not "relevant evidence that a reasonable person might accept as adequate" to support the conclusion Taylor intended to threaten District Attorney Welch at the time he published his posts. *State v. Garcia*, 358 N.C. 382, 412 (2004).

The evidence the State relies upon in challenging this conclusion is minimal. According to the State, the evidence Taylor intended to threaten District Attorney Welch with death or bodily harm is that he described his posts as threats, he texted a friend his posts might get him in "[t]rouble with the law," and he asked his Facebook friends to "share" his posts on District Attorney Welch's Facebook page. As the Court of Appeals correctly observed, none of this evidence is evidence supporting the reasonable inference that Taylor "had the specific intent to threaten D.A. Welch, i.e., that Defendant *intended* D.A. Welch to believe he was actually planning to kill her." *Taylor*, 270 N.C. App. at 569–70.

Assuming the evidence does support the inference that Taylor considered his posts to be "threats"—and that he wanted District Attorney Welch to learn of his posts—these inferences do not answer the question of what message Taylor believed the threats contained which he hoped District Attorney Welch would receive. Not all threats are criminally proscribable. The content of what is being threatened matters. Had Taylor posted a message promising that if District Attorney Welch did not

prosecute the parents of the children who died he would organize nightly protests outside of her house, or a message promising to run against District Attorney Welch in a future election if she did not change course, it might be reasonable to conclude Taylor communicated a threat with the intent to instill fear. Yet, obviously, in neither of these circumstances would it be possible to conclude Taylor communicated a threat against District Attorney Welch in a manner which satisfies the elements of the true threats analysis.

¶ 94    Similarly, Taylor's apparent belief that his posts might lead to attention from law enforcement is not, in this context, evidence of Taylor's subjective intent to threaten. Read together, Taylor's messages reflect his profound distrust in Macon County's law enforcement officials and its judicial system. His text to a friend that his posts might get him in "trouble" is indicative of his beliefs about local law enforcement. There is no evidence supporting the conclusion that Taylor believed he would get in "[t]rouble with the law" because he knew he had just threatened District Attorney Welch's life.

¶ 95    The evidence presented by the State supports nothing more than "mere speculation or conjecture" that Taylor communicated his messages with the specific intent of threatening District Attorney Welch. *State v. Polke*, 361 N.C. 65, 72 (2006). Holding the State to its burden is especially important where, as in this case, failure to do so can chill protected speech and therefore comes at the cost of all North

Carolinians' First Amendment rights. Absent substantial evidence of Taylor's intent to threaten District Attorney Welch, the majority disserves the First Amendment principles it purports to uphold by speculatively reaching for a conclusion the evidence does not reasonably support. Therefore, I dissent from the portion of the majority opinion holding that the State has presented substantial evidence to support the conclusion that Taylor communicated a true threat to District Attorney Welch.